**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | | |
|---|---|---|
| CARL ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:13-1449 |
| | ) | |
| BOHDAN FARBOTA and | ) | |
| M.P. EXPRESS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants M.P. Express, Inc. and Bohdan Farbota (hereinafter referred to as "Defendants"), respectfully submit this Memorandum in Support of Defendants' Motion for Partial Summary Judgment with respect to the claims asserted by Plaintiff Carl Adams ("Adams" or "Plaintiff") in his First Amended Complaint (hereinafter referred to as the "Complaint").

## FACTUAL BACKGROUND

This lawsuit arises out of an alleged automobile accident that occurred on September 9, 2013 on Interstate 65 North at mile marker 95.40. (Compl. ¶ 5). Plaintiff asserts that a tractor trailer driven by Defendant Bohdan Farbota and owned by Defendant, M.P. Express, Inc., collided with his Chevy Silverado. (*Id.*). In his Complaint, Plaintiff makes various allegations of negligence against both Defendants and seeks damages for "pain, suffering, emotional distress and the loss of ability to participate in and enjoy the pleasures of life…." (Compl. ¶ 18). Additionally, Plaintiff seeks damages for "medical expenses, past, present and future lost earnings and earning capacity…." (Compl. ¶ 19). According to Plaintiff's Initial Disclosures, Plaintiff seeks, *inter alia*, $46,270.71 in past medical expenses; "[f]uture medical expenses

1

according to proof"; "[g]eneral damages according to proof"; and "[p]ermanent impairment according to proof." (Doc. 27, p. 3)

In the Case Management Order filed by this Court on February 25, 2014, this Court ordered Plaintiff "shall declare to the defendant the identify of any expert witnesses and provide all of the information specified in Rule 26(a)(2)(B)" by close of business on August 30, 2014. (Doc. 16, p. 3). To date, Plaintiff has not produced any Rule 26 disclosure, identifying any expert witness that will provide expert testimony in this case or disclosing the subject matter of any expected expert testimony.[1] Plaintiff has not produced any general Rule 26 disclosures pursuant to Fed. R. Civ. P. 26(a)(2)(A), reports pursuant to Fed. R. Civ. P. 26(a)(2)(B), or disclosures for witnesses who do not provide written reports pursuant to Fed. R. Civ. P. 26(a)(2)(C).

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, the standard for summary judgment is essentially the same as the standard governing directed verdicts. *See Goldsmith v. Olon Andrews, Inc.*, 941 F.2d 423, 425 (6th Cir. 1991).

---

[1] On Monday, December 1, 2014, Plaintiff's counsel forwarded a letter *drafted by Plaintiff's counsel* and signed by Dr. McCombs regarding "the causation of Mr. Adams injury and treatment." It is unclear the purpose of this letter as it does not satisfy the disclosure requirements set forth in Fed. R. Civ. P. 26.

2

Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In meeting this burden, the nonmoving party must adduce more than a scintilla of evidence; it is not sufficient for the nonmoving party merely to "show that there is some metaphysical doubt as to the material facts." *Id.* (internal quotation marks omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587. If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Liberty Lobby*, 477 U.S. at 249-52. Summary judgment and directed verdict both require non-movants to produce substantial evidence to survive summary judgment. *Id.* at 252.

## ARGUMENT

Because Plaintiff failed to produce any Rule 26 disclosure in this case, disclosing the identity of any witnesses he intends to use at trial or the substance of their testimony, Plaintiff is unable to meet his burden of proof to support his claim for damages. Most importantly, Plaintiff has failed to identify any expert to support his claim for damages for past and future medical expenses, loss of future earning capacity and permanent impairment. Alternatively, to the extent Plaintiff attempts to identify his treating physician, Dr. Paul McCombs, as an expert witness, *Defendants* are entitled to take the discovery deposition of Dr. McCombs; and, because of his failure to disclose Dr. McCombs as an expert pursuant to this Court's deadline, Plaintiff should not be permitted to take Dr. McCombs' deposition testimony for purposes of *proof* without affording Defendants an opportunity to first depose Dr. McCombs for discovery purposes. Further, in the event Plaintiff is permitted to elicit expert testimony from Dr. McCombs, or any

3

other expert, that was not previously identified in any Rule 26 disclosure, Defendants request an extension of their deadline to identify experts in response to any late-identified expert Plaintiff intends to rely on at trial.

I. **PLAINTIFF FAILED TO PRODUCE ANY RULE 26 DISCLOSURE, IDENTIFYING ANY EXPERT WITNESS(ES) TO TESTIFY AS TO MEDICAL CAUSATION AND THEREFORE CANNOT SUSTAIN A CLAIM FOR PAST AND FUTURE MEDICAL EXPENSES, LOSS OF FUTURE EARNING CAPACITY AND/OR PERMANENT IMPAIRMENT.**

   A. *Plaintiff's Claim for Past Medical Expenses Should be Dismissed as a Matter of Law.*

"An injured plaintiff bears the burden of proving that medical expenses the plaintiff is seeking to recover are necessary and reasonable." *Borner v. Autry*, 284 S.W.3d 216, 218 (Tenn. 2009). Tennessee law requires a plaintiff seeking to recover damages resulting from a personal injury allegedly caused by a defendant to present expert testimony both to prove that his or her medical expenses were reasonable and necessary and to establish that a plaintiff's physical injury was, in fact, caused by the incident at issue. *See Al-Athari v. Gamboa*, 2013 WL 6908937, at *3 (Tenn. Ct. App. Dec. 30, 2013)(attached hereto as **Exhibit A**); *citing Borner*, 284 S.W.3d at 218-19 ("In all but the most obvious and routine cases, plaintiffs must present competent expert testimony to meet this burden of proof."); *Miller v. Choo Choo Partners, L.P.*, 73 S.W.3d 897, 901 (Tenn. Ct. App. 2001) (causation of  medical condition allegedly caused by negligence of a defendant must be established by medical expert); *Klamborowski v. Johnson¸* 2014 WL 2002140, *4 (Tenn. Ct. App. May 13, 2014)(attached hereto as **Exhibit B**) ("[T]he subject of Plaintiff/Appellant's injuries [sustained in an automobile accident] was not one that is discernable by laymen and requires expert proof.").

Because Plaintiff failed to identify any experts pursuant to this Court's Order and Fed. R. Civ. P. 26, Plaintiff cannot support his claim for past medical expenses in the amount of

$46,270.71 because he cannot meet his "burden of proving that medical expenses the plaintiff is seeking to recover are necessary and reasonable." *Borner*, 284 S.W.3d at 218. Plaintiff is required under Tennessee law to "present competent expert testimony to meet this burden of proof." *Id.* Not only has Plaintiff failed to identify any expert witnesses by close of business on August 30, 2014, as ordered by this Court, Plaintiff has not, as of the filing of this Motion, produced any Rule 26 disclosure in this case, disclosing any experts expected to testify at trial or the subject matter on which the witness is expected to present evidence in this matter.[2] Consequently, Plaintiff's claim for past medical expenses should be dismissed as a matter of law.

    **B.**     ***Plaintiff's Claim for Future Medical Expenses Should be Dismissed as a Matter of Law.***

In Tennessee:

> To remove awards for future medical expenses from the realm of speculation, persons seeking future medical expenses must present evidence (1) that additional medical treatment is reasonably certain to be required in the future and (2) that will enable the trier-of-fact to reasonably estimate the cost of the expected treatment.

*Singh v. Larry Fowler Trucking, Inc.*, 390 S.W.3d 280, 287 (Tenn. Ct. App. 2012). "It requires the plaintiff to establish with some degree of certainty that he or she will undergo future medical treatment for the injuries caused by the defendant's negligence." *Id.* "[U]nder Tennessee law . . . the standard for receiving evidence of future medical treatment or expense must be based upon a *reasonable degree of medical certainty*." *Lemmons v. Marien*, 1988 WL 55016, *2 (Tenn. Ct.

---

[2] The 2010 Advisory Committee Notes to Fed. R. Civ. P. 26(a)(2)(C) state: "Rule 26(a)(2)(C) is added to mandate summary disclosures of the opinions to be offered by expert witnesses who are not required to provide reports under Rule 26(a)(2)(B) and the facts supporting those opinions." It further states, "[a] witness who is not required to provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and also provide expert testimony under Evidence Rule 702, 703, or 705. Frequent examples include physicians or other health care professionals and employees of a party who do not regularly provide expert testimony. ***Parties must identify such witnesses under Rule 26(a)(2)(A) and provide the disclosure required under Rule 26(a)(2)(C).***" (Emphasis added).

App. June 3, 1988) (citing *Kincaid v. Lyerla*, 680 S.W.2d 471 (Tenn. Ct. App. 1984)) (emphasis added) (attached hereto as **Exhibit C**). "Thus, in order to be helpful to a jury, [a physicians'] testimony concerning possible future surgeries must be made with a reasonable degree of medical certainty." *Singh*, 390 S.W.3d at 287.

In the case at bar, Plaintiff has failed to produce any Rule 26 disclosure, disclosing or identifying any expert witness expected to testify at trial or identifying any expert testimony "(1) that additional medical treatment is reasonably certain to be required in the future and (2) that will enable the trier-of-fact to reasonably estimate the cost of the expected treatment." *Singh*, 390 S.W.3d at 287. Moreover, Plaintiff has failed to provide expert testimony that would satisfy the "reasonable degree of medical certainty" standard for setting forth evidence of future medical treatment. As such, Plaintiff's claims for future medical expenses should be dismissed as a matter of law.

    **C.**     *Plaintiff's Claim for Damages for Permanent Impairment and Loss of Future Earning Capacity Should be Dismissed as a Matter of Law.*

To establish a claim for loss of earning capacity as an element of damages, a plaintiff must prove:

> (1) Proof of the existence of some earning capacity – either actual or potential – prior to the injury;
>
> (2) Proof that this earning capacity has been lost or diminished;
>
> (3) *Proof that the cause of the lost or diminished earning capacity is proximately caused by the injury*; and
>
> (4) Proof of the dollar amount of the loss.

*Oglesby v. Riggins*, No. W2010-01470-COA-R3-CV, 2011 WL 915583, at *6 (Tenn. Ct. App. Mar. 27, 2011)(attached hereto as **Exhibit D**) (citing 29 Am.Jur.3d *Proof of Lost Earning Capacity* § 6 (1995)) (emphasis added). While expert proof is not always necessary to put on proof of loss of earning capacity, Plaintiff should be required to do so in this case. In Tennessee:

6

> The general rule is that where the physical impairment can be objectively ascertained, and where its connection to impairment of earning capacity is obvious or ascertainable from other evidence, then separate medical testimony is not required to establish the elements of proximate cause between impairment and earning capacity . . . . **Where, however, the physical impairment is obscure or subjective, or where the connection between the physical impairment and earning capacity is not obvious, then expert medical testimony may be essential.**

*Id.* (emphasis added).

Since Plaintiff's alleged physical impairment is not obvious, "causation [related to a medical condition] must be established by expert medical testimony." *Messer*, 1987 WL 20070, *4. Here, expert proof is necessary to establish damages because an expert is needed to opine as to the extent the Plaintiff's alleged injuries have caused any loss of earning capacity or future earning capacity. During his deposition, Plaintiff testified:

> Q:     Has a physician ever told you that you are permanently impaired as a result of the September 9th, 2013 accident?
>
> A:     No.
>
> Q:     Has any other medical provider ever told you that you are permanently impaired as a result of this September 9, 2013, accident?
>
> A:     No, ma'am.

(Carl Adams Depo. Sept. 4, 2014, p. 68:15-22)(Adams Depo. transcripts are attached hereto as collective **Exhibit E**).

In addition to Plaintiff's own testimony that he has never been told he is permanently impaired, Plaintiff has not offered any evidence of any permanent injury, and Plaintiff has not secured any expert witness to testify that he is permanently impaired. Plaintiff cannot demonstrate any medical, permanent impairment through expert testimony; thus, he cannot sustain a claim for loss of earning capacity resulting from any accident involving Defendants.

7

Consequently, Plaintiff's claims for damages for permanent impairment and loss of earning capacity should be dismissed as a matter of law.

## II.   ALTERNATIVELY, DEFENDANTS MOVE FOR A DISCOVERY CONFERENCE TO DISCUSS THE DEPOSITION OF DR. PAUL MCCOMBS AND A POTENTIAL EXTENSION OF DEFENDANTS' DEADLINE TO IDENTIFY EXPERTS.

When questioned about his claimed damages during his deposition, Plaintiff testified that no physician or any other medical provider told him that he, Plaintiff, was going to require any future medical treatment, surgery or otherwise, as a result of the accident that allegedly occurred on September 9, 2013. (Adams Depo. Sept. 4, 2014, pp. 57:22-58:1). He similarly testified that no physician ever told him he was permanently impaired as a result of the accident at issue. (Adams Depo., p. 68:15-22). While Plaintiff testified he did not have any back pain prior to the September 9, 2013 accident (Adams Depo., p. 128:3-6), the medical records indicate Plaintiff disclosed to Dr. Paul McCombs, Plaintiff's treating physician, that Plaintiff's low back pain symptoms[3] began "[s]even to eight years ago." (Adams Depo., p. 127:19-20).

Prior to September 2013, Plaintiff's back pain was treated with physical therapy, exercise programs, pain medication, anti-inflammatories, chiropractic treatment and thirty (30) epidural steroid injections. (Adams Depo., pp. 131:6-132:2). Further, even though Plaintiff's medical records indicate he had an epidural spinal steroid injection a mere two weeks prior to the September 9, 2013 accident, during his deposition, Plaintiff could not recall receiving that injection, or any of the other twenty-nine (29) epidural spinal injections he received for his chronic back pain in the months and years preceding the accident that is the subject of this litigation. (Adams Depo., pp. 156:17-167:16). Approximately one week following the accident, Plaintiff visited his treating physician, Dr. Paul McCombs, and indicated on his medical history

---

[3] Plaintiff claims that as a result of the alleged automobile accident on September 9, 2013, he now suffers from significant low back pain. (Adams Depo., pp. 49:21-50:11).

8

questionnaire that his injury was *not* caused by an automobile accident. (Adams Depo., p. 133:6-14).

Following Plaintiff's deposition, on September 11, 2014, Defendants informed Plaintiff of their intent to depose Plaintiff's treating physician, Dr. Paul McCombs, and, for HIPAA reasons, requested Plaintiff coordinate such deposition since he is Plaintiff's treating physician. *See* September 11, 2014 E-mail attached hereto as **Exhibit F**. Thereafter, on October 2, 2014, Plaintiff noticed the deposition of Dr. Paul McCombs, Plaintiff's treating physician,[4] claiming that the deposition will be taken on oral examination *for proof* on November 19, 2014.[5] Out of an abundance of caution, Defendants subsequently served a Cross-Notice of Deposition of Paul McCombs, M.D., for discovery purposes on October 10, 2014.[6] When counsel and Dr. McCombs arrived for Dr. McComb's deposition on November 17, 2014, counsel for the parties disagreed as to which party was entitled to take the deposition, and which party would be permitted to cross-examine the deponent. Further, it was unclear as to whether the deposition was going to be taken for proof or discovery purposes as the Notice/Cross Notices indicate Plaintiff's intent to take Dr. McComb's deposition *for proof* and Defendants' intent to take a discovery deposition. The deposition was postponed to give the parties an opportunity to determine the proper method for completing Dr. McComb's deposition in this case.

As outlined above, Plaintiff failed to identify and disclose any expert, medical or otherwise, to Defendants in any Rule 26 disclosure, either before the deadline of August 30,

---

[4] Plaintiff mistakenly sites to Rule 26 of the *Tennessee* Rules of Civil Procedure in his Notice of Deposition.

[5] Plaintiff's Notice of Deposition is attached hereto as **Exhibit G.**

[6] Defendants' Cross-Notice of Deposition of Paul McCombs, M.D. is attached hereto as **Exhibit H.**

2014, or to date. Because of Plaintiff's failure to abide by this Court's Order regarding disclosure of expert(s), there is concern Plaintiff is attempting to circumvent the expert disclosure deadline by noticing the deposition of Dr. McCombs and indicating that the deposition would be taken on oral examination *for proof*.[7] Because Plaintiff failed to disclose Dr. McCombs as an expert in this lawsuit and because of the prejudicial effect it would have on Defendants, Plaintiff should not be permitted to take Dr. McCombs' deposition for *proof* or elicit any expert testimony from Dr. McCombs due to Plaintiff's failure to comply with the Court's Rule 26 disclosure deadline. Alternatively, Plaintiff should not be permitted to elicit expert testimony from Dr. McCombs without identifying such testimony in a Rule 26 disclosure and then affording Defendants an opportunity to depose Dr. McCombs for discovery purposes prior to any deposition "for proof".[8] It would be prejudicial to Defendants to potentially bind Defendants to Dr. McComb's deposition testimony without sufficient notice of his opinions and the bases for his opinions. Accordingly, Defendants request a discovery conference for instruction on the proper method for completing Dr. McComb's deposition in this case.  Further, in the event Dr. McCombs is permitted to provide expert testimony in this case, Defendants request an extension of their expert disclosure deadline to respond to any late-identified expert testimony Plaintiff intends to rely on at trial.

## CONCLUSION

For the reasons stated herein, Defendants respectfully move for partial summary judgment in Defendants' favor as to Plaintiff's claims for damages for past and future medical expenses, loss of earning capacity, and permanent impairment. Alternatively, Defendants request

---

[7] *See supra* fn. 1.

[8]   It is unclear as to why Dr. McComb's deposition is needed "for proof" as he is not "unavailable" under the *Federal Rules of Civil Procedure* for purposes of appearing at the trial of this matter.

Case 3:13-cv-01449   Document 30-2   Filed 12/03/14   Page 10 of 71 PageID #: 141

a discovery conference wherein the Court instructs the parties on the proper method for completing Dr. McComb's deposition in this case and an extension of Defendants' expert disclosure deadline.

Respectfully submitted,

/s/ Tricia T. Olson
Tricia Olson (#24643)
ADAMS AND REESE LLP
424 Church Street, Suite 2800
Nashville, Tennessee 37219
Phone: (615) 259-1007
Fax:     (615) 259-1470
Email:  tricia.olson@arlaw.com
*Attorney for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 3rd day of December 2014, a true and exact copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to:

Bart Durham
1712 Parkway Towers
404 James Robertson Parkway
Nashville, Tennessee 37219

Ashonti T. Davis, Esq.
Butler Snow
150 3rd Avenue S. Ste. 1600
Nashville, TN 37201

/s/ Tricia T. Olson
Tricia T. Olson

11

# EXHIBIT A

2013 WL 6908937
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee.

Jennifer L. AL–ATHARI and Haider Al–Athari
v.
Luis A. GAMBOA and Morgan Southern, Inc.

No. M2013–00795–COA–R3–CV.  |
Oct. 15, 2013 Session.  |  Dec. 30, 2013.

Appeal from the Circuit Court for Davidson County, No.
10C2024; Thomas W. Brothers, Judge.

**Attorneys and Law Firms**

Jennifer L. Al–Athari and Haider Al–Athari, Antioch,
Tennessee, Pro Se.

Steven Douglas Parman, Nashville, Tennessee for the
appellee, Morgan Southern, Inc.

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion
of the Court, in which FRANK G. CLEMENT, JR. and
ANDY D. BENNETT, JJ., joined.

**OPINION**

PATRICIA J. COTTRELL, P.J., M.S.

 **\*1**  A woman driving a passenger vehicle was involved in a
motor vehicle accident with a tractor trailer. The woman and
her husband filed a complaint alleging negligence and loss
of consortium against the other driver and against the owner
of the tractor trailer. The Plaintiffs did not comply with the
deadlines set out in the Scheduling Order and, as a result,
they were precluded from introducing medical testimony or
records in support of their claims. On the day set for trial, the
Plaintiffs told the court they were not prepared to try their case
and wanted to go home. The trial court dismissed the case
without prejudice, with the option of filing a new complaint
within a year, and the Plaintiffs appealed. We hold the trial
court did not abuse its discretion in dismissing the Plaintiffs'
Complaint, and, accordingly, affirm the trial court's judgment.

**I. PROCEDURAL HISTORY**

Jennifer L. Al–Athari and Luis A. Gamboa were involved in
a motor vehicle accident in July 2009. When the collision
occurred, Mrs. Al–Athari was driving a family vehicle,
and Mr. Gamboa was driving a tractor trailer that was
owned by Morgan Southern, Inc. Mrs. AlAthari and her
husband, Haider Al–Athari, filed a Complaint on June 2,
2010, asserting negligence against Mr. Gamboa and Morgan
Southern. Mrs. Al–Athari alleged that the collision caused
her to suffer personal injuries, physical and mental pain and
suffering, loss of enjoyment of life, and possibly permanent
injury. Mr. Al–Athari claimed that he suffered loss of
consortium as a result of the accident. Mrs. Al–Athari sought
an award of damages in the amount of $75,000, and Mr. Al–
Athari sought an award of damages in the amount of $15,000.

Morgan Southern filed an Answer denying liability. The
record contains no evidence that Mr. Gamboa was ever served
with the Complaint despite numerous attempts to have him
served. [1] The trial court entered a Scheduling Order on June
18, 2012. The court set deadlines for mediation, medical
depositions, scheduled a case management conference, and
set the trial for January 14, 2013.

Mr. and Mrs. Al–Athari had two different attorneys represent
them over the course of this case, and each attorney filed a
motion to withdraw from representation based on his inability
to communicate effectively with Mr. and Mrs. Al–Athari
regarding the case's management. The trial court granted each
attorney's motion and granted Mr. and Mrs. AlAthari thirty
days to obta

Because Mr. Gamboa was never served with the Complaint,
the case proceeded against Morgan Southern. On December
12, 2012, Morgan Southern filed a motion *in limine* asking
the court to exclude from evidence "any testimony or
documentation concerning medical diagnoses, medical and/
or other treatment bills allegedly incurred by plaintiffs,
physical impairment and/or limitations."The basis for
Morgan Southern's motion was that the Scheduling Order
provided a deadline of December 1, 2012, for medical
depositions to be taken, and the Al–Atharis had failed to take
any medical depositions by that date.

 **\*2**  This motion was heard on January 4, 2013. The Al–
Atharis did not appear for this hearing. The trial court granted
the defendant's motion on January 11. The court wrote, "It

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

1

appearing to the Court that the motion is well taken and should be granted, it is accordingly ORDERED that Plaintiffs are precluded from introducing at the trial of this cause any testimony or documentation concerning medical diagnoses, medical and /or other treatment bills allegedly incurred by Plaintiffs, physical impairment and/or limitations."

Morgan Southern subsequently filed three other motions *in limine* seeking to preclude the Al-Atharis from introducing evidence regarding (1) Mr. Gamboa's legal status in the United States or the process by which Morgan Southern hired Mr. Gamboa, (2) any offers of compromise or settlement or statements made during the parties' attempted mediation, and (3) Morgan Southern's liability insurance coverage. The trial court granted each of these motions *in limine* on January 14, 2013.

On January 7, 2013, one week before the trial was scheduled, the Al-Atharis filed a motion asking the court to continue the trial to allow Mrs. Al-Athari to finish her medical treatment. The court denied the motion on January 14, stating in an Order that the motion was "not well-taken."

The trial against Morgan Southern was scheduled to take place on January 14, 2013. When the judge asked Mr. and Mrs. Al-Athari whether they were ready to proceed on January 14, Mr. Al-Athari asked whether they had the right to remain silent. The judge indicated that unlike a criminal trial, their silence could be used against them. Mr. and Mrs. Al-Athari then indicated that they did not wish to proceed and wanted to go home. The judge decided at that point to dismiss the Al-Atharis' case involuntarily, without prejudice. The judge announced that Mr. and Mrs. Al-Athari would have one year from the date of its Order to refile their Complaint and start the case all over again if they wished. The Order of Dismissal was dated January 18, 2013, and it stated:

> This cause came on to be heard for trial on January 14, 2013. The Plaintiffs specifically represented that they did not wish to go forward. It further appearing to the Court that the Plaintiffs were not properly prepared to proceed with the trial of the case, the Court determined that it would dismiss the case involuntarily, without prejudice, pursuant to Rule 41.02. It is accordingly

> ORDERED that this case be, and the same hereby is, dismissed without prejudice. Costs are taxed to the Plaintiffs for which let execution issue if necessary.

Following the trial court's dismissal of their Complaint, Mr. and Mrs. Al-Athari filed numerous motions including a motion for reconsideration, a motion for judgment on the pleadings, and a motion for a new trial. The trial court denied all of the Al-Atharis' motions, explaining that they were "not well-taken."

## II. ISSUES ON APPEAL

**\*3** Mr. and Mrs. Al-Athari duly filed a notice of appeal. In their brief, Mr. and Mrs. AlAthari review the proceedings before the trial court and the trial court's rulings, but they do not specify which rulings they would like us to review on appeal. Under the circumstances, and in the absence of more specific direction from the Al-Atharis, we will review the trial court's decisions granting Morgan Southern's four motions *in limine,* the court's denial of Mr. and Mrs. Al-Athari's motion for a continuance, and the court's dismissal of the Complaint. Morgan Southern contends the Al-Atharis filed a frivolous appeal and seeks damages pursuant to Tenn.Code Ann. § 27–1–122.

We review each of the trial court's rulings at issue under an abuse of discretion standard. *See Singh v. Larry Fowler Trucking, Inc.,* 390 S.W.3d 280, 284 (Tenn.Ct.App.2012) (appellate court reviews trial court's ruling on motion *in limine* under abuse of discretion standard); *State v. Schmeiderer,* 319 S.W.3d 607, 617 (Tenn.2010) ("granting of a continuance lies within the sound discretion of the trial court"); *Hodges v. Attorney General,* 43 S.W.3d 918, 921 (Tenn.Ct.App.2000) (decisions to dismiss for failure to prosecute are discretionary and reviewing court will second-guess trial court only if it has acted unreasonably, arbitrarily, or unconsciously). Under the abuse of discretion standard, a trial court's ruling

> "will be upheld so long as reasonable minds can disagree as to propriety of the decision made."*State v. Scott,* 33 S.W.3d 746, 752 (Tenn.2000); *State v. Gilliland,* 22 S.W.3d 266, 273 (Tenn.2000). A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining."*State v. Shirley,* 6 S.W.3d 243, 247 (Tenn.1999). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.,* 970 S.W.2d 920, 927 (Tenn.1998).

*Eldridge v. Eldridge,* 42 S.W.3d 82, 85 (Tenn.2001).

## A. Morgan Southern's Motions *in Limine*

We turn first to the trial court's judgments granting Morgan Southern's motions *in limine.* Morgan Southern's first motion *in limine* sought to preclude Mr. and Mrs. Al–Athari from introducing testimony or documentation concerning medical diagnoses, medical and/or other treatment bills allegedly incurred by plaintiffs, or physical impairment and/or limitations. The basis for Morgan Southern's motion was that the Scheduling Order set a deadline of December 1, 2012, for medical depositions to be taken, and that as of December 12, 2012, when Morgan Southern filed its first motion *in limine,* the Al–Atharis had taken no medical depositions.

The law requires a plaintiff seeking to recover damages resulting from a personal injury to present competent expert testimony (1) to prove medical expenses were necessary and reasonable and (2) to establish that a plaintiff's physical injury was in fact caused by the incident at issue. *See Borner v. Autry,* 284 S.W.3d 216, 218 (Tenn.2009) (injured plaintiff bears burden to prove medical expenses are necessary and reasonable by presenting competent expert testimony); *Miller v. Choo Choo Partners, L.P.,* 73 S.W.3d 897, 901 (Tenn.Ct.App.2001) (causation of medical condition must be established by medical expert).

**\*4** Mr. and Mrs. Al–Athari did not appear at the hearing on this motion, and the record contains no evidence that they ever asked the court to modify the Scheduling Order to provide them more time to procure expert medical testimony. The Al–Atharis have not presented any legal argument explaining how the trial court abused its discretion in granting Morgan Southern's first motion *in limine,* and we find no error in the court's judgment granting this motion. We therefore affirm the trial court's judgment in this regard. [2]

With regard to Morgan Southern's other three motions *in limine,* we conclude the trial court did not abuse its discretion in granting any of those motions. The second motion *in limine* concerned Mr. Gamboa's legal status and the process by which Morgan Southern hired Mr. Gamboa. The Al–Atharis did not assert a negligent hiring or negligent entrustment claim against Morgan Southern; Mr. Gamboa's immigration status and the process by which he was hired is therefore not relevant to their case. [3]

Morgan Southern's third and fourth motions *in limine* concerned areas that are well-settled and governed by the Tennessee Rules of Evidence and Tennessee Rules of Civil Procedure. With regard to Morgan Southern's motion to exclude evidence of Morgan Southern's offer to compromise or settle the Al–Atharis's claims, Rule of Evidence 408 states in pertinent part:

> Evidence of (1) furnishing or offering to furnish or (2) accepting or offering to accept a valuable consideration in compromising or attempting to compromise a claim, whether in the present litigation or related litigation, which claim was disputed or was reasonably expected to be disputed as to either validity or amount, is not admissible to prove liability for or invalidity of a civil claim or its amount or a criminal charge or its punishment. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

Similarly, Tennessee Rule of Civil Procedure 68 provides that evidence of an offer of judgment is not admissible.

Morgan Southern's final motion was to exclude any evidence of Morgan Southern's liability insurance coverage. Tennessee Rule of Evidence 411 makes it clear that evidence of liability insurance coverage may not be introduced to prove negligence:

> Evidence that a person was or was not insured against liability is not admissible upon issues of negligence or other wrongful conduct. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

*Goff v. Elmo Greer & Sons Const. Co., Inc.,* 297 S.W.3d 175, 198 (Tenn.2009) (intentional admission of insurance coverage evidence during trial may be grounds for mistrial).

## B. Mr. and Mrs. Al–Athari's Motion for Continuance

One week prior to the date the trial was scheduled to begin, Mr. and Mrs. Al–Athari filed a motion asking the court to continue the trial because Mrs. Al–Athari's medical treatment

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

was not yet completed. The trial court denied this motion on February 14, 2013.

> **\*5** A motion for a continuance is addressed to the sound discretion of the trial judge and his ruling on the motion will not be disturbed in the absence of an abuse of discretion to the prejudice of the defendant. An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied [a party] a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted.

*State v. Hines,* 919 S.W.2d 573, 579 (Tenn.1995) (citations omitted).

Mr. and Mrs. Al–Athari have not presented evidence that they were denied a fair trial or that continuing the trial would have resulted in a different outcome. Regardless of whether or not Mrs. Al–Athari's medical treatments were continuing, the trial court's earlier Order granting Morgan Southern's first motion *in limine* precluded Mr. and Mrs. Al–Athari from introducing any evidence concerning Mrs. Al–Athari's medical diagnoses, medical and/or other treatment bills allegedly incurred, or physical impairment and/or limitations. Accordingly, we affirm the trial court's denial of Mr. and Mrs. Al–Athari's motion for a continuance.

## C. Dismissal of Complaint

The final ruling we review is the trial court's Order of Dismissal which dismissed Mr. and Mrs. Al–Athari's Complaint without prejudice. The trial court gave Mr. and Mrs. AlAthari every opportunity to go forward with their case on January 14, 2013. It was only after Mr. and Mrs. Al–Athari indicated they did not intend to present any evidence and just wanted to go home that the court declared its intention to dismiss the Plaintiffs' case involuntarily, without prejudice, pursuant to Tennessee Rule of Civil Procedure 41.02. Rule 41.02(1) states:

> For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against the defendant.

The Court of Appeals has reviewed this rule and explained,

> This rule is necessary to enable the court to manage its own docket, and to protect defendants against plaintiffs who are unwilling to put their claims to the test, but determined to subject them to the continuing threat of an eventual judgment. Like the decision to grant or deny a continuance, a trial court's decision to dismiss a case for failure to prosecute is within its sound discretion, and will not be reversed unless there is abuse of that discretion.

*Osagie v. Peakload Temporary Servs.,* 91 S.W.3d 326, 329 (Tenn.Ct.App.2002) (citing *Mallard v. Tompkins,* 44 S.W.3d 73 (Tenn.Ct.App.2000), *Russell v. Crutchfield,* 988 S.W.2d 168 (Tenn . Ct.App.1998), and *Blake v. Plus Mark, Inc.,* 952 S.W.2d 413 (Tenn .1997)).

The trial court did not dismiss Mr. and Mrs. Al–Athari's Complaint until it was apparent they were not prepared to try their case. By dismissing their case without prejudice, the trial court gave the Al–Atharis an opportunity to prepare their case. The trial court made it clear in open court that Mr. and Mrs. Al–Athari have up to one year from the date of the court's order dismissing the case to file a new complaint and start their case all over again.

**\*6** Mr. and Mrs. Al–Athari do not explain on appeal how the trial court abused its discretion by dismissing their Complaint for failure to prosecute. We hold the trial court did not abuse its discretion in so ruling and, accordingly, affirm the trial court's judgment dismissing their case without prejudice. [4]

## D. Sanctions for Frivolous Appeal

Morgan Southern contends this appeal is frivolous, within the meaning of Tenn.Code Ann. § 27–1–122, and asks this Court to award them damages. According to § 27–1–122,

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include

but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

The fact that a party is successful on appeal does not automatically entitle him or her to damages under this statute. However, a successful party should not have to bear the cost of a frivolous, or groundless, appeal. *Barnett v. Tennessee Orthopaedic Alliance,* 391 S.W.3d 74, 84 (Tenn.Ct.App.2012). An appeal is frivolous if it is devoid of merit or has no reasonable chance of success. *Young v. Barrow,* 130 S.W.3d 59, 66 (Tenn.Ct.App.2003) (citing *Combustion Eng'g, Inc. v. Kennedy,* 562 S.W.2d 202, 205 (Tenn.1978) and *Davis v. Gulf Ins. Group,* 546 S.W.2d 583, 586 (Tenn.1977)).

We do not believe the Al-Atharis filed this appeal for purposes of delay, but we find the appeal is frivolous within the meaning of the statute and that the Al-Atharis should have known they had no reasonable chance of success on appeal. The Al-Atharis did not comply with the deadlines the trial court set in the Scheduling Order, they had no competent medical proof to support their claims for relief,[5] and they informed the court on the day the case was set for trial that they did not wish to proceed with their trial. On appeal, the Al-Atharis fail to articulate any basis upon which this Court could conclude the trial court erred in granting Morgan Southern's motions *in limine,* denying their motion for a continuance, or in dismissing their Complaint. Moreover, the trial court dismissed Mr. and Mrs. Al-Athari's Complaint without prejudice.

We remand this case to the trial court to determine the appropriate amount of damages to which Morgan Southern is entitled for the frivolous appeal pursuant to Tenn.Code Ann. § 27–1–122.

### III. CONCLUSION

The trial court's rulings are affirmed in all respects. Costs of this appeal shall be taxed to the appellants, Jennifer Al-Athari and Haider Al-Athari, for which execution shall issue if necessary.

Footnotes

1   According to Morgan Southern, an original summons was issued for Mr. Gamboa on June 2, 2010, and was returned on July 30 with the notation "not to be found." An alias summons was then issued on August 2, 2010, which was returned "not to be found" on September 7. A third summons was apparently issued on September 8, 2010, and was returned marked "not to be found" on September 27.

2   Mr. and Mrs. Al-Athari complain that Morgan Southern's attorney is required to represent both Mr. Gamboa as well Morgan Southern. The record contains no evidence, however, that Mr. Gamboa was ever served with the Complaint. Unless Mr. Gamboa is properly served, the Al-Atharis cannot proceed against him. Mr. and Mrs. Al-Athari also assert their former attorney(s) did not adequately represent them. If the Al-Atharis have claims against their former attorneys, they must initiate a separate action; they cannot bring claims against an individual not named as a defendant in their Complaint.

3   If, after filing their Complaint, the Al-Atharis discovered information supporting additional claims against Morgan Southern, they could have filed a motion to amend their Complaint to include additional causes of action against Morgan Southern.

4   Based on our holding that the trial court did not abuse its discretion in dismissing the Plaintiffs' Complaint, we also hold the trial court did not err in denying the post-trial motions Mr. and Mrs. Al-Athari filed seeking a new trial or other relief.

5   We cannot consider the proposed evidence the Al-Atharis submit to this Court because that evidence was not properly introduced or submitted to the trial court and is therefore not a part of the official record. *See generally* Rule 26 of the Tennessee Rules of Civil Procedure, governing discovery methods.

**End of Document**    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.    5

# EXHIBIT B

2014 WL 2002140
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee.

Kristina Kay KLAMBOROWSKI, et al.

v.

Jason S. JOHNSON, et al.

No. M2013–01304–COA–R3–CV.  |  Assigned
on Briefs April 11, 2014.  |  May 13, 2014.

Direct Appeal from the Circuit Court for Rutherford County,
No. 59974; J. Mark Rogers, Judge.

**Attorneys and Law Firms**

J.P. Barfield, Nashville, Tennessee, for the appellant, Kristina
Kay Klamborowski.

Herbert J. Sievers, III, Nashville, Tennessee, for the appellee,
Allstate Property and Casualty Insurance Company.

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the
Court, in which DAVID R. FARMER, J., and HOLLY M.
KIRBY, J., joined.

**OPINION**

ALAN E. HIGHERS, P.J., W.S.

 *1  Plaintiff filed suit after she allegedly sustained injuries in
an automobile accident. A jury trial was held, and at the close
of Plaintiff's proof, a verdict was directed in Plaintiff's favor
as to the liability of Defendant. However, the jury returned a
verdict in favor of Plaintiff for zero dollars. Plaintiff filed a
motion for additur or a new trial, which the trial court denied.
We affirm the judgment of the trial court.

**I. FACTS & PROCEDURAL HISTORY**

This case arises out of an automobile accident on
November 24, 2008. On November 24, 2009, Kristina
Kay Klamborowski and Mark David Klamborowski[1] filed
a *pro se* Complaint against Jason Johnson and their
uninsured motorist provider, Allstate Insurance Company

("Allstate").[2] The Klamborowskis alleged that Mrs.
Klamborowski was injured when the vehicle in which she
was a passenger was struck by Mr. Johnson's vehicle. The
Klamborowski's Complaint sought damages for lost wages,
pain and suffering, and medical expenses. Mr. Johnson filed
a *pro se* Answer denying that Mrs. Klamborowski's alleged
injuries were caused by the automobile accident. Allstate also
filed an Answer asserting numerous defenses.

In 2010, the Klamborowskis obtained counsel. After several
continuances, the matter was tried before a jury on February
26 and February 27, 2013. According to the parties,[3] at the
close of Mrs. Klamborowski's proof, the trial court granted
Mrs. Klamborowski's Motion for a Directed Verdict as to the
liability of Mr. Johnson. The jury, however, returned a verdict
in favor of Mrs. Klamborowski for zero dollars, finding,
despite Mr. Johnson's liability for the accident, that she was
not entitled to damages.

Mrs. Klamborowski filed a Motion for New Trial or Additur.
Following a hearing,[4] the trial court entered a succinct Order
Affirming Verdict, refusing to grant an additur or to order a
new trial. Mrs. Klamborowski timely appealed to this Court.

**II. ISSUE PRESENTED**

Although presented by Mrs. Klamborowski as two issues,
we perceive the sole issue on appeal to be whether the trial
court erred in failing to grant a new trial due to the alleged
inadequacy of the jury verdict.[5] For the following reasons,
we affirm the judgment of the trial court.[6]

**III. STANDARD OF REVIEW**

"The standard of review in determining whether an appellate
court should require a new trial because of the inadequacy
of a jury verdict is whether the amount awarded falls below
the range of reasonableness."*Harville v. Wolfe,* No. E1999–
02263–COA–R3–CV2000 WL 72033, at *1 (Tenn.Ct.App.
Jan. 27, 2000) (quoting *Smith v. Shelton,* 569 S.W.2d
421 (Tenn.1978))."In reviewing the adequacy of the jury's
award, we note that '[the determination of] the amount of
compensation in a personal injury case is primarily for the
jury, and that next to the jury, the most competent person
to pass on the matter is the trial judge who presided at the
trial and heard the evidence.' " *Kinnard v. Taylor,* 39 S.W.3d

120, 122 (Tenn.Ct.App.2000) (quoting *Foster v. Amcon Int'l, Inc.* 621 S.W.2d 142, 146 (Tenn.1981)). "[O]ur analysis is limited to a determination of whether the record reflects material evidence demonstrating that the jury's award is 'at or above the lower limit of the range of reasonableness, giving full faith and credit to all of the evidence that tends to support that amount.' " *Miller v. Williams,* 970 S.W.2d 497, 498 (Tenn.Ct.App.1998) (quoting *Poole v. Kroger Co.,* 604 S.W.2d 52, 54 (Tenn.1980)). "We are required to take the strongest legitimate view of all the evidence, including all reasonable inferences therefrom, to sustain the verdict; to assume the truth of all evidence that supports it; and to discard all evidence to the contrary." *Id.* (citing *Poole,* 604 S.W.2d at 54). We do not reweigh the evidence nor do we determine witness credibility. *Id.* (citing *Poole,* 604 S.W.2d at 54).

### IV. DISCUSSION

**\*2**  On appeal, Mrs. Klamborowski argues that a verdict for zero dollars was not within the range of reasonableness because, according to Mrs. Klamborowski, the uncontradicted expert testimony established that Mrs. Klamborowski suffered "some injury" and that "at least some evaluation and treatment was necessary."Mrs. Klamborowski's appellate brief is not a model of clarity, but she appears to argue that she should have been awarded damages of approximately $4,800.00 for medical evaluations and treatment as well as damages for pain and suffering. [7] In response, Allstate contends that Mrs. Klamborowski failed to prove, by a preponderance of the evidence, that her injuries were caused by the accident in question rather than by either a prior automobile accident or her occupation.

At trial, Mrs. Klamborowski testified regarding her alleged injuries and treatment. She testified that immediately following the accident she was shaken-up and unsure whether she had been injured. However, she claimed that "probably[ ] the next day or the day after that[ ][her] back started to hurt. [She] got a headache. [Her] neck was bothering [her]." "[A] couple of weeks" after the accident, she visited her primary care physician, Dr. Kozinski, "for all of about 5 or 10 minutes" to complain of back and hand pain. According to Mrs. Klamborowski, Dr. Kozinski "didn't know why [she] was having pain in [her] hand and why [she] was having back troubles" and he believed her symptoms were due to carpal tunnel syndrome. Thus, Dr. Kozinski referred her to a hand specialist, Dr. Joyner. Dr. Joyner then referred Mrs. Klamborowski to a neurologist, Dr. Cherdak, for carpal

tunnel syndrome testing. According to Mrs. Klamborowski, the test results indicated that she did not suffer from carpal tunnel syndrome. Then, in June, Mrs. Klamborowski sought treatment from a chiropractor, Dr. Wesley Stewart, who performed adjustments and "other various [procedures]" to "loosen up [her] back so he can do straightening and help [her] spine and [her] neck."

Mrs. Klamborowski testified that she is employed as a graphics computer operator which requires her to "type for a living[.]" She claimed that pain in both her head and back and numbness in her hands following the accident prevented her from soliciting new contracts. On cross-examination, Mrs. Klamborowski could not provide documentation of jobs she was unable to solicit because, she claimed, the nature of her business is verbal. She was also admittedly unable to provide any evidence regarding lost wages, either past or future. However, on re-direct, Mrs. Klamborowski stated her opinion that she "could have made 20 to $30,000 just from [the Olympics]" event she was unable to solicit.

In her trial testimony, Mrs. Klamborowski acknowledged that she suffered whiplash in a 2006 automobile accident, necessitating chiropractic treatment for five and one-half months. She stated that following the 2006 accident, "[e]very once in a while, [her] hand would get a little tingling just from sitting and working."She also admitted that after the 2006 accident, she experienced pain in her back and neck. However, she insisted that, after the 2008 accident, her hand "got extremely worse[,]" her back "started hurting [ ] more[,]" her headaches worsened, and she began having trouble sleeping.

**\*3**  It appears that Mr. Johnson was the only other witness at trial. He admitted that he lost control of his vehicle while making a turn in the rain. He estimated that he was traveling approximately thirty to thirty-five miles per hour and he stated that the Klamborowski's vehicle was also moving, in the same direction, at the time of impact. Mr. Johnson testified that after the accident, the Klamborowskis refused medical attention and they "got in their car and sped off after yelling at [him]."

Again, Mrs. Klamborowski argues on appeal that the unrefuted expert medical testimony indicated that she suffered "some injury" and that "at least some evaluation and treatment was necessary."Thus, she contends that the jury's award of zero damages is not supported by material evidence.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

In her appellate brief, Mrs. Klamborowski points to her own trial testimony regarding her medical encounters following the accident. However, in challenging the zero damage award, she primarily relies upon expert deposition testimony purportedly establishing that the 2008 accident caused her injuries and that she incurred reasonable and necessary medical expenses to evaluate and treat such injuries. For example, Mrs. Klamborowski cites what she claims is Dr. Cherdak's deposition testimony in which he allegedly opined that the 2008 accident "could have been .... a contributing factor" to her injuries or "an exacerbation of a medical condition" and that a $443.00 medical bill "seemed reasonable." She also cites the deposition testimony of Dr. Stewart in which he opined with a "reasonable degree of chiropractic certainty" that the 2008 accident had caused her injuries because, according to Dr. Stewart, "nothing else [ ] was presented that would explain the injuries that [he] found."However, according to Allstate, Dr. Stewart indicated that he was unaware of Mrs. Klamborowski's 2006 automobile accident when such relevant information should have been revealed. According to Mrs. Klamborowski, Dr. Stewart also stated in his deposition that Mrs. Klamborowski incurred a chiropractic fee of $4416.00, which he testified was a reasonable fee for the necessary treatment she received

In her brief, Mrs. Klamborowski also cites case law holding that a zero verdict cannot stand where damages are established by unrefuted expert proof.*Watson v. Payne,* 359 S.W.3d 166 (Tenn.Ct.App.2011), involved a fact pattern similar to the instant case. In *Watson,* the defendant admitted fault for an automobile accident and a trial was conducted on the issue of damages. *Id.* at 166.The jury awarded the plaintiff zero damages, and the trial court denied the plaintiff's motion for additur or a new trial. *Id* . The plaintiff appealed arguing that the jury could not ignore expert proof and award zero damages where the only medical proof indicated that the plaintiff had sustained at least some injury. *Id.* On appeal, this Court determined that the jury's award of zero damages was not within the range of reasonableness because the unrefuted expert testimony supported an award minimally equal to medical expenses incurred to evaluate the plaintiff for injuries following the accident. *Id.* at 170–71.

**\*4** Similarly, in *Wilhoit v. Rogers,* No. E2012–00751–COA–R3–CV, 2013 WL 3717425, at \*13 (Tenn.Ct.App. July 12, 2013)*perm. app. denied* (Tenn. Nov. 13, 2013),

the eastern section of this Court reversed a zero damages verdict for medical expenses and personal injuries, following a stipulation of liability, where undisputed expert proof of injury, causation, and harm existed.

"The law requires a plaintiff seeking to recover damages resulting from a personal injury to present competent expert testimony (1) to prove medical expenses were necessary and reasonable and (2) to establish that a plaintiff's physical injury was in fact caused by the incident at issue."*Al–Athari v. Gamboa,* No. M2013–00795–COA–R3–CV, 2013 WL 6908937, at \*3 (Tenn.Ct.App. Dec.30, 2013) (citing *Borner v. Autry,* 284 S.W.3d 216, 218 (Tenn.2009); *Miller v. Choo Choo Partners, L.P.,* 73 S.W.3d 897, 901(Tenn.Ct.App.2001))." '[A]ggravation of a pre-existing condition is a compensable element of damages.' " *Wilhoit,* 2013 WL 3717425, at \*12 (quoting *Taylor,* 2003 WL 21487112, at \*3). Additionally, when reasonableness and necessity are demonstrated by expert proof, "[g]enerally, a plaintiff in a negligence action is entitled to recover reasonable expenses for medical examinations to determine if the plaintiff sustained injuries, even where it is determined that the plaintiff sustained no injury." *See Watson,* 359 S.W.3d at 170 (citing *Newsom v. Markus,* 588 S.W.2d 883, 887 (Tenn.Ct.App.1979).

Ironically, Mrs. Klamborowski argues in her brief that "[t]he subject of Plaintiff/Appellant's injuries was not one that is discernable by laymen and requires expert proof[.]" We agree. Unfortunately, the expert deposition testimony relied upon by Mrs. Klamborowski to establish her damages is not included in the record on appeal, nor is it clear that it was ever presented to the jury. [8] Given the lack of expert proof concerning damages, we find material evidence to support the jury's verdict of zero damages. The judgment of the trial court is affirmed.

## V. CONCLUSION

For the aforementioned reasons, we affirm the judgment of the trial court. Costs of this appeal are taxed to Appellant, Kristina Kay Klamborowski, and her surety, for which execution may issue if necessary.

Footnotes

1    Mark David Klamborowski was apparently dismissed from the case prior to trial.

2    Allstate has filed an Appellee's brief. Mr. Johnson has not participated in this appeal.

3    The record contains only transcripts of the trial testimony of Mrs. Klamborowski and Mr. Johnson.

4    No transcript from this hearing is included in the record.

5    The Court of Appeals does not have the authority to grant an additur under Tennessee Code Annotated section 20–10–101. *See Poole v. Kroger Co.,* 604 S.W.2d 52, 54 (Tenn.1980); *Wilkerson v. Altizer,* 845 S.W.2d 744, 749 (Tenn.Ct.App.1992).

6    In her brief, Mrs. Klamborowski briefly argues that the trial court "erred when [it] failed to instruct the jury after the verdict as to an award for damages." This argument is not developed, however, nor is it listed as an issue for review. Therefore, we will not consider the propriety of the jury instructions on appeal.

7    Klamborowski's argument regarding pain and suffering, which contains no citations to either authority or the record, essentially consists of a single assertion that Allstate did not present evidence that she *did not* experience anxiety as a result of the accident. Because Mrs. Klamborowski has failed to present a sufficient argument with regard to the non-award for pain and suffering as required by Tennessee Rule of Appellate Procedure 27(a), we consider the issue waived. *See Boggs Kurlander Steele, LLC v. Horizon Commc'ns,* No. M2006–00018–COA–R3–CV, 2008 WL 490628, at *4 (Tenn.Ct.App. Feb.21, 2008) (citing *Newcomb v. Kohler Co.,* 222 S.W.3d 368, 402 (Tenn.Ct.App.2006)).

8    Two pages of Dr. Stewart's deposition are attached to Allstate's "Opposition to Motion for New Trial or Additur." Notwithstanding the post-trial timing of the submission, " '[t]he law is clear that statements of fact made in or attached to pleadings [or] briefs ... are not evidence and may not be considered by an appellate court unless they are properly made part of the record.' *i.e.,* approved by the trial court." *Reid v. Reid,* 388 S.W.3d 292, 295 (Tenn.Ct.App.2012) (quoting *Threadgill v. Bd. of Prof'l Responsibility of Supreme Court,* 299 S.W.3d 792, 812 (Tenn.2009) *overruled on other grounds by Lockett v. Board of Professional Responsibility,* 380 S.W.3d 19 (Tenn. July 3, 2012)).

    At trial, the judge asked Mrs. Klamborowski's counsel whether Dr. Stewart's deposition would be introduced into evidence. Counsel responded that the deposition would be introduced into evidence at a later time, but the transcript contains no indication of a later introduction and no trial exhibits are included in the record on appeal.

---

**End of Document**                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.      4

# EXHIBIT C

1988 WL 55016
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee, Eastern Section.

Joseph Robert LEMMONS and Sarah
Lynn Lemmons, Plaintiffs-Appellees,
v.
John P. MARIEN, Defendant-Appellant.

June 3, 1988.

Loudon Law, C.A. # 57, Don T. McMurray Judge.

**Attorneys and Law Firms**

Dalton L. Townsend and Dean B. Farmer, Knoxville, for appellant.

Terry G. Vann, Lenoir City, for appellees.

### OPINION

GODDARD, Judge.

 **\*1** John P. Marien appeals a judgment rendered against him in the amount of $90,000 in favor of Joseph Robert Lemmons for personal injuries sustained by Mr. Lemmons as a result of a vehicular accident.

By his issues on appeal Mr. Marien insists that the testimony of Dr. Gerald Harriss, a dentist who treated Mr. Lemmons, was improperly admitted; that testimony of Dr. William Stallworth, a radiologist, was improperly excluded; that the Trial Court improperly charged the jury regarding earning capacity; and that the verdict was excessive.

The accident giving rise to this suit occurred on Saturday, September 14, 1985, about 11:00 a.m. The University of Tennessee football team was playing in Knoxville and for this reason traffic was heavier than usual. Mr. Lemmons, a lieutenant on the Tennessee Highway Patrol, was investigating an abandoned vehicle on Interstate 75 near its intersection with Interstate 40. He had radioed for a wrecker to remove the vehicle and was waiting in his vehicle on the right shoulder of the north-bound lane behind the abandoned car when the wrecker arrived. The wrecker proceeded in front of the abandoned car and began backing toward it. At about this time a car, whose driver was unknown, for some reason, slowed abruptly. A second car operated by Jeffrey H. Elliott, was able to stop some 10 or 15 feet behind the first car and a third car, operated by Paul Snyder, Jr., was able to slow down to almost a stop when it was struck in the rear by a recreational vehicle being operated by Mr. Marien. The impact knocked the third car into the second car and the recreational van veered to the right, struck and came to rest against the cruiser. It does not appear from the photographs that the cruiser was struck a particularly severe blow, although Mr. Lemmons did testify the repair bill was $1500.

Mr. Lemmons' arm and hand were numb after the accident and he radioed for an ambulance which transported him to Park West Hospital where he was examined, x-rayed and released.

Mr. Lemmons incurred medical expenses of some $6200, including a disputed dental bill of $3000. Although he continues to suffer intermittent pain, he has lost only the half day of the accident from his employment. He has been evaluated by his treating physician as having a 10 or possibly 15 percent permanent partial disability.

Returning to the issues on appeal, the Defendant insists that Dr. Harriss, the dentist, did not testify with the requisite degree of medical certainty that the condition for which he treated Mr. Lemmons was caused by the accident. In this regard, Dr. Harriss testified as follows:

### DIRECT EXAMINATION

Q Doctor, tell us if you will what could cause the problem that you found with Mr. Lemmons in January of '87?

A Lots of factors could. Trauma, malocclusion, loss of teeth, particularly posterior. There would be a multitude that could cause this.

Q When you say trauma, what do you mean?

A An accident, a wreck, being hit in the jaw. You know, any type of physical trauma like that could cause it, could distalize the whole jaw.

### CROSS-EXAMINATION

**\*2**  Q In the course of your testimony I think you've indicated that the kind of complaint that Mr. Lemmons had in January of 1987 has a number of causes?

A Right.

Q Is that a fair statement?

A Oh, yes.

Q And, in fact, one of those causes simply a job stress can cause it?

A Yes.

Q Another cause would be alignment problems with the teeth and alignment problems that could arise due to having numerous crowns or having a spacer or something like that, it getting out of adjustment?

A Right.

Q Therefore, from that understanding, what I understand you to say, you cannot within a reasonable degree of medical certainty say that the TMJ problem that you treated Mr. Lemmons for was actually related to the one event that occurred in September of 1985 a year and a half before you treated him?

A No. Not with a hundred percent certainty, no.

### RE-DIRECT EXAMINATION

Q Doctor, let me clear one point up. Mr. Farmer asked you if you could say with a reasonable degree of medical certainty that an impact like Mr. Lemmons received in this automobile that we're talking about caused this problem, and you said not a hundred percent certain. Is it probable that that impact caused this problem?

A I would say it's probable since he gave no history of it before.

### RE-CROSS EXAMINATION

Q Doctor, is it equally probable that other causal factors that we discussed about teeth alignment, stress, could also cause this problem?

A They can definitely cause it. It could be a combination, too.

It would appear under Tennessee law that the standard for receiving evidence of **future medical** treatment or **expense** must be based upon a **reasonable degree** of **medical certainty**. *Kincaid v. Lyerla,* 680 S.W.2d 471 (Tenn.App.1984); *Reserve Life Ins. Co. v. Whittemore,* 59 Tenn.App. 495, 442 S.W.2d 266 (1969).

The rule seems, however, to have been relaxed as to causation in worker's compensation cases when the courts have accepted testimony of "more probable," *American Ins. Co. v. Ison,* 538 S.W.2d 382 (Tenn.1976) and "could," *Cortrim Mfg. Co. v. Smith,* 570 S.W.2d 854 (Tenn.1978); *P & L const. Co., Inc. v. Lankford,* 559 S.W.2d 793 (Tenn.1978); *Shelby Mutual Ins. Co.,* 574 S.W.2d 43 (Tenn.1978).

We believe, however, the correct rule as to causation in a tort action has been set out by Justice Drowota in the recent case of *Lindsey v. Miami Development Co.,* 689 S.W.2d 856 (Tenn.1985), wherein the Court adopted the following rule (at page 861):

As Prosser notes:

"The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant ...

The plaintiff is not, however, required to prove the case beyond a reasonable doubt. The plaintiff need not negative entirely the possibility that the defendant's conduct was not a cause and it is enough to introduce evidence from which reasonable persons may conclude that it is more probable that the event was caused by the defendant than that it was not ...." Prosser, § 41, p. 269.

....

**\*3**  The admissibility of an expert medical opinion, of course, should not turn on whether the testifying physician

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

characterizes a particular potential cause of an injury as "conceivable," "possible" or "probable." *See Trapp v. 4-10 Investment Corp.,* 424 F.2d 1261, 1268 (8th Cir.1970). Regardless of the term employed, if the physician's

"testimony is such in nature and basis of hypothesis as to judicially impress that the opinion expressed represents his professional judgment as to the most likely one among the possible causes of the physical condition involved, the court is entitled to admit the opinion and leave its weight to the jury." *Norland v. Washington General Hospital,* 461 F.2d 694, 697 (Cir.8, 1972).

Applying the rule of *Lindsey* to the testimony of Dr. Harriss, we conclude that upon a fair reading of his testimony it may be inferred that he was of the opinion that it was more likely that the condition for which he treated Mr. Lemmons was a result of the accident.

As to the second issue, we have reviewed the deposition of Dr. Stallworth, which was filed. By and large it merely states that he viewed the x-rays taken on the day of the accident and found no abnormality. This fact was testified to by Dr. Snyder, the attending physician of Mr. Lemmons, and as such was cumulative. It follows that the error, if any, in excluding the testimony was harmless as contemplated by Rule 36 of the Tennessee Rules of Appellate Procedure.

As to the third issue, even though Mr. Lemmons had lost no time from his work except the initial half-day, because of the testimony regarding his partial disability, limited activity, and continued pain, we are of the opinion the charge given by the Court as to impaired earning capacity was proper.

The Defendant finally urges us, as authorized by Chapter 10, Title 20 of Tennessee Code Annotated to grant a remittitur because the verdict was excessive.

In addressing the standard of review in cases where the trial judge had denied a remittitur and approved the verdict, this Court, speaking through Judge Anderson in *Taylor v. Vaughn,* filed in Knoxville on March 7, 1988, stated the following:

The appellate scope of review applicable to this jury verdict approved by the trial judge is whether or not there is any material evidence to support the verdict. "Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Rule 13(d),

Tennessee Rules of Appellate Procedure. As the Supreme Court stated in *Ellis v. White Freightliner Corp.,*

The trial judge's approval of a jury verdict invokes the material evidence rule with respect to all other issues of fact and we know of no reason why that rule should not have the same effect when that approval includes the amount of the award.

603 S.W.2d 125, 129 (1980). *Accord Poole v. Kroger Co.,* 604 S.W.2d 52 (1980); *Foster v. AmCon International, Inc.,* 621 S.W.2d 142, 146 (1981).

**\*4** Such a scope of review is limited to a determination of whether there is any material evidence to support the verdict, and "it [our review] must be governed by the rule, safeguarding the constitutional right of trial by jury, which requires us to take the strongest legitimate view of all the evidence to uphold the verdict, to assume the truth of all that tends to support it, to discard all to the contrary, and to allow all reasonable inferences to sustain the verdict." ... And if there is material evidence to support the verdict it must be affirmed.

*Poole v. Kroger Co., supra,* at 54-55 (citations omitted).

Because the Trial Court approved the verdict as rendered by the jury, it is incumbent upon us to view the proof as to Mr. Lemmons' damages in a light most favorable to him. We accordingly adopt the statement of his brief as to the injuries and damages he sustained:

On September 14, 1985, while on duty as an officer for the Tennessee Highway Patrol, Appellee Joseph Robert Lemmons was injured when his patrol car was struck by a motor home driven by Appellant John P. Marien. Mr. Lemmons suffered a hyperextension injury of the neck accompanied by muscle spasms, headaches, arm and back pains. Mr. Lemmons was initially examined and treated at Park West Hospital. After the accident, and until the time of the trial, Mr. Lemmons was treated by his family physician, Dr. Edward Snyder of Loudon Tennessee. Prior to the accident, Mr. Lemmons had no medical problems. After the accident, Mr. Lemmons suffered pain in his neck, back and arm. The pain interfered with Mr. Lemmons' ability to perform his duties as a highway patrolman, his ability to exercise and his ability to do physical labor at home and on his farm. The pain was sometimes so severe that medication was required.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Dr. Snyder testified that Mr. Lemmons was 50% to 60% disabled for several months following the accident and that he has a 10% to 15% permanent disability as a result of the accident.

As a result of the accident, Mr. Lemmons also suffered dental problems which required extensive treatment. Dr. Gerald Harriss testified that he had treated Mr. Lemmons for many years and that the problems which Mr. Lemmons suffered after the accident had not existed prior to the accident. Dr. Harriss stated that the impact of the accident, and the stress resulting therefrom, were causes of Mr. Lemmons' dental problems.

At the time of trial, Mr. Lemmons had incurred medical and dental expenses of $6,111.65.

We conclude upon review of the entire record that there is no material evidence to support an award of $90,000, and a remittitur is accordingly suggested in the amount of $45,000, reducing the judgment to $45,000. In the event Mr. Lemmons does not desire to accept the remittitur a new trial will be granted.

For the foregoing reasons the judgment of the Trial Court as modified is affirmed and the cause remanded for collection of the judgment and costs below or a new trial as the case may be. Costs of appeal are adjudged against Mr. Lemmons.

FRANKS, J., and CHARLES E. NEARN, Special Judge, concur.

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

2011 WL 915583
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee.

Jan OGLESBY and John Oglesby
v.
Edwin T. RIGGINS.

No. W2010-01470-COA-R3-CV.  |  Jan. 20, 2011
Session Heard at Memphis.  |  March 17, 2011.

Direct Appeal from the Circuit Court for Shelby County, No.
CT-001027-08; D.J. Alissandratos, Special Judge.

**Attorneys and Law Firms**

Donald A. Donati and William B. Ryan, Memphis,
Tennessee, and D. Briggs Smith Batesville, MS, for the
appellants, Jan Oglesby and John Oglesby.

Garrett M. Estep, Memphis, Tennessee, for the appellee,
Edwin T. Riggins.

J. STEVEN STAFFORD, J., delivered the opinion of the
Court, in which DAVID R. FARMER, J., and HOLLY M.
KIRBY, J., joined.

**OPINION**

J. STEVEN STAFFORD, J.

**\*1** This case arises from a car accident in which Appellant
was injured when her vehicle was struck by Appellee's
vehicle. Following a jury trial, the jury awarded Appellant
damages, including $100,000 for Appellant's loss of earning
capacity claims. Acting as the thirteenth juror, and based
upon its finding that Appellant had failed to meet her burden
to show loss of earning capacity, the trial court suggested
remittitur of the entire $100,000 loss of earning capacity
award. Appellant appeals. Discerning no error, we affirm.

Jan Oglesby is married to John Oglesby ("Plaintiffs" or
"Appellants"). [1]  At all relevant times, Mrs. Oglesby was both
an employee and a part-owner of Gulliver's Travel Poplar
Avenue. Gulliver's Travel Poplar Avenue is the holding
company for two retail locations in Memphis, Gulliver's
Travel Wolfchase (a/k/a Gulliver's Travel Germantown) and

Gulliver's Travel Oak Court. At the time of the hearing,
Gulliver's Travel Poplar Avenue owned one hundred percent
of Gulliver's Travel Oak Court and sixty-five percent of
Gulliver's Travel Wolfchase. Gulliver's Travel was started by
the Bagatelas family in Illinois and has been in business for
over thirty years. After opening an agency in Memphis in
1984, Todd Bagatelas hired Mrs. Oglesby as a sales person.
Mrs. Oglesby excelled in that position and soon became a
driving force in the success of the business. Consequently,
Mrs. Oglesby was offered an ownership interest in the holding
company in 1987 or 1988. Since that time, she has owned
fifty percent of Gulliver's Travel Poplar Avenue. As part-
owner, Mrs. Oglesby's income is derived from the sales, and
specifically the commissions paid on the sales, of both retail
locations; however, Mrs. Oglesby works out of the Oak Court
location.

Mrs. Oglesby's specialty is group trips, which she began
putting together in the 1980s. Over the years, Mrs. Oglesby
has developed a devoted clientele and has escorted many
trips. As Mrs. Oglesby explained in her testimony, she
researches the trips and puts together an itinerary for
the group. She then sells the trip (usually soliciting her
repeat clients first). While traveling with the groups, Mrs.
Oglesby testified that, depending on the group makeup, she
performed many tasks. On some trips with elderly clients,
Mrs. Oglesby assisted them with their luggage and with
walking. On other trips, with more nimble clientele, Mrs.
Oglesby testified that she would lead the group in hiking
and other more adventurous undertakings. The group trips
account for approximately fifty percent of the total revenue
earned by Gulliver's Travel Oak Court.

On Thursday, April 12, 2007, Jan Oglesby was on her way
home from work at Gulliver's Travel Oak Court when her
vehicle was struck from behind by a vehicle driven by
Appellee Edwin T. Riggins. The record indicates that Mrs.
Oglesby was traveling South on Colonial Road, and was
stopped with her left turn signal on, waiting for traffic to clear
so that she could turn left onto Spottswood Avenue. Kimberly
Smith, a witness to the accident, testified that she (i.e., Mrs.
Smith) was driving North on Colonial, and that she saw Mr.
Riggins' vehicle approaching, but that it did not appear that
he engaged his brakes prior to hitting Mrs. Oglesby's vehicle.

**\*2** As a result of the collision, Mrs. Oglesby testified
that she experienced pain in her left shoulder and neck, as
well as contusions to her head, knees, and chest. Although
Mrs. Oglesby did not seek medical attention at the time

of the accident, she testified that, beginning the day after the wreck, her whole body was sore and hurting. Based upon her symptoms, Mrs. Oglesby went to her physician on Monday, April 16, 2007, and explained that she had been in a car accident the previous Thursday. At the time of that visit, she was complaining of pain in her left shoulder and neck. Dr. Bill Bourland prescribed physical therapy for Mrs. Oglesby's neck, and referred Mrs. Oglesby to Dr. David Deneka, an orthopedic specialist, for her left shoulder. Dr. Deneka testified that he diagnosed Mrs. Oglesby with left rotator cuff strain and impingement of the rotator cuff.[2] Mrs. Oglesby's left shoulder was treated with medication, physical therapy, home exercises, and steroid injections.

For her neck injuries, Dr. Deneka referred Mrs. Oglesby to Dr. Michael Sorenson, who specializes in physical medicine and rehabilitation with an emphasis in interventional spine care. Dr. Sorenson began treating Mrs. Oglesby in November of 2007, and diagnosed her with a cervical neck strain with disk protrusion. Upon physical examination, Dr. Sorenson noted that Mrs. Oglesby had reduced range of motion in her neck and that she exhibited pain and tenderness in her neck. Dr. Sorenson recommended medication and continued physical therapy.

On or about February 22, 2008, the Oglesbys filed a complaint against Mr. Riggins in the Shelby County Circuit Court, alleging that Mr. Riggins was negligent in the operation of his vehicle, and that this negligence caused the Oglesbys to suffer damages. On or about March 3, 2008, the Oglesbys filed an amended complaint alleging the following damages,: (1) past present, and future mental and physical pain and suffering; (2) permanent physical impairment; (3) injuries requiring past, present, and future medical treatment; (4) past, present, and future medical expenses; (5) loss of enjoyment of life; (6) wage and benefits loss; and (7) any other damages available in law or equity, including out-of-pocket expenses and post-judgment interest. Mr. Oglesby also claimed loss of consortium. Mr. Riggins filed his answer on April 2, 2008. Also, in order to recover under their uninsured/underinsured motorist coverage, the Oglesbys served a copy of their amended complaint on their automobile insurance carrier, which filed its answer on April 4, 2008.

Following discovery, a jury trial was held on April 5th through April 7th, 2010. The jury unanimously found that Mr. Riggins was at fault, and awarded Mrs. Oglesby damages in the amount of $157,626.35 and Mr. Oglesby $3,000 on his loss of consortium claim. Specifically, the jury awarded

$15,000 for past pain and suffering; $15,000 for future pain and suffering; $0 for permanent impairment; $10,000 for past loss of enjoyment of life; $10,000 for future enjoyment of life; $7,626.35 for medical expenses; $40,000 for loss of past earning capacity, and $60,000 for loss of future earning capacity. The Oglesbys also moved for, and were awarded, $8,493.60 in discretionary costs against Mr. Riggins.

**\*3** On April 16, 2010, Mr. Riggins filed a post-trial motion, seeking to alter or amend, or in the alternative, for remittitur of the portion of the verdict relating to damages for loss of earnings both past (i.e., $40,000) and future (i.e., $60,000). The Oglesbys' insurance company also joined in Mr. Riggins' motion. On April 21, 2010, the Oglesbys filed a response opposing Mr. Riggins' motion.

On April 26, 2006, the trial court entered an order granting Mr. Riggins' post-trial motion and suggesting remittitur in the amount of $100,000, which consisted of Jan Oglesby's $40,000 award for past loss of earnings and $60,000 award for future loss of earnings. On May 6, 2010, Mrs. Oglesby filed a notice of acceptance of remittitur under protest. Final judgment was entered by the trial court on May 21, 2010. The Oglesbys filed a timely notice of appeal, and raise two issues for review, as stated in their brief:

> 1. Whether the trial court erred in suggesting a remittitur of the jury's award of $40,000 to Jan Oglesby for past loss of earnings based on speculation and passion even where the Defendant/Appellee acknowledged that Mrs. Oglesby had sustained some past economic losses.

> 2. Whether the trial court erred in failing to follow the principles set forth in *Overstreet v. Shoney's, Inc.,* 4 S.W.3d 694 (Tenn.Ct.App.1999) in suggesting a remittitur of the jury's $60,000 award to Jan Oglesby for future loss of earning capacity based on the fact that the jury did not award Mrs. Oglesby any money for permanent impairment, as well as speculation and passion.

As discussed by this Court in *Grandstaff v. Hawks,* 36 S.W.3d 482 (Tenn.Ct.App.2000):

> In personal injury cases, calculation of damages is within the province of the jury. *See Lunn v. Ealy,* 176 Tenn. 374, 376, 141 S.W.2d 893, 894 (1940). Nevertheless, the trial court may suggest remittitur of a verdict if the court finds that the verdict is excessive. *See* Tenn.Code Ann. § 20-10-102(a) (1994). If the party in whose favor the verdict has been rendered refuses to make the remittitur,

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2

the trial court must grant a new trial. *See City of Gatlinburg v. Fox,* 962 S.W.2d 479, 481 (Tenn.1998). If, however, the party accepts the remittitur under protest, the party may then appeal the trial court's finding that the verdict was excessive. *See* Tenn.Code Ann. § 20-10-102(a); *City of Gatlinburg v. Fox,* 962 S.W.2d at 481.

Trial courts should suggest remittitur if it would accomplish justice between the parties without the cost and delay inherent in a new trial. *See Turner v. Jordan,* 957 S.W.2d at 823; *Thrailkill v. Patterson,* 879 S.W.2d 836, 840 (Tenn.1994). If possible, the courts should utilize the remedy of remittitur, rather than ordering a new trial based on the size of the jury verdict. *See Thrailkill v. Patterson,* 879 S.W.2d at 840; *United Brake Sys., Inc. v. American Envtl. Prot., Inc.,* 963 S.W.2d 749, 760 (Tenn.Ct.App.1997).

*Grandstaff,* 36 S.W.3d at 499.

**\*4** Regarding remittitur of a jury verdict, statutory provisions outline the authority of both the trial court and this Court. Tennessee Code Annotated § 20-10-102 provides, in relevant part, as follows:

> (b) The court of appeals shall review the action of the trial court suggesting a remittitur using the standard of review provided for in T.R.A.P. 13(d) applicable to decisions of the trial court sitting without a jury. If, in the opinion of the court of appeals, the verdict of the jury should not have been reduced, but the judgment of the trial court is correct in other respects, the case shall be reversed to that extent, and judgment shall be rendered in the court of appeals for the full amount originally awarded by the jury in the trial court.

Tenn.Code Ann. § 20-10-102(b) (2009).

Tennessee Rule of Appellate Procedure 13(d) states that "review of findings of fact by the trial court in civil actions shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." However, conclusions of law are not afforded the

same presumption. *Langschmidt v. Langschmidt,* 81 S.W.3d 741, 744-45 (Tenn.2002).

In *Long v. Mattingly,* 797 S.W.2d 889 (Tenn.Ct.App.1990), Judge, now Justice, Koch succinctly explained the role of appellate courts in reviewing a trial court's suggestion of remittitur on a jury verdict:

> The role of the appellate courts is to determine whether the trial court's adjustments were justified, giving due credit to the jury's decision regarding the credibility of the witnesses and due deference to the trial court's prerogatives as thirteenth juror....
>
> The contours of the scope of appellate review have changed over the years. Now, the appellate courts customarily conduct a three-step review of a trial court's adjustment of a jury's damage award. First, we examine the reasons for the trial court's action since adjustments are proper only when the court disagrees with the amount of the verdict. Second, we examine the amount of the suggested adjustment since adjustments that "totally destroy" the jury's verdict are impermissible. Third, we review the proof of damages to determine whether the evidence preponderates against the trial court's adjustment.
>
> If, after reviewing the record, we determine that the adjusted damage award is still excessive, we have the prerogative under Tenn.Code Ann. § 20-10-103(a) (Supp.1989) to reduce the damages further.

*Love v. Mattingly,* 797 S.W.2d at 896 (citations omitted). Under *Love,* the three-step approach applicable to this Court's review of a trial court's suggestion of remittitur is as follows: (1) first, we examine the reasons for the trial court's action since adjustments are proper only when the court disagrees with the amount of the verdict. *Palanki ex rel. Palanki v. Vanderbilt Univ.,* 215 S.W.3d 380 (Tenn.Ct.App.2006) (citing *Love,* 797 S.W.2d at 896); *see also Burlison v. Rose,* 701 S.W.2d 609, 611 (Tenn.1985); (2) second, we examine the amount of the suggested adjustment since adjustments that "totally destroy" the jury's verdict are impermissible. *Love,* 797 S.W.2d at 896; *see also Foster v. Amcon Int'l, Inc.,* 621 S.W.2d 142, 148 (Tenn.1981); [3] *Guess v. Maury,* 726 S.W.2d 906, 913 (Tenn.Ct.App.1986); (3) third, we review the proof of damages to determine whether the evidence preponderates against the trial court's adjustment. *See* Tenn.Code Ann. § 20-10-102(b).

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

3

**\*5** Keeping the foregoing principles in mind, we turn to the record. In reaching its decision on the suggestion of remittitur, the trial court made the following statements from the bench, which statements were included, by reference, in the court's order of April 26, 2010:

> Having heard all the evidence as a 13th juror, I must tell you that the Plaintiff's allegations of past loss of earnings and future loss of earnings, in this Court's opinion, w[ere] purely speculative. There is no better word to more accurately describe it.

> The Court understands the jury's verdict and when the jury says that there ... was zero permanent impairment, the Court then has to take a look at ... if there's zero permanent impairment, how can you have loss of future earning? Even if it is speculative.

> ... I am going to suggest a remittitur of the $60,000 for loss of future earnings to be removed and that also [for] the loss of past earnings of $40,000.

\* \* \*

> I realize that this case has had a lot of emotion to it, but I must tell y'all this as plainly as I can: Socrates said the law is reason devoid of passion....

> ... I listened carefully to th[is] case. All the proof that the Plaintiff had on this point [ ] rested upon passion. It was not [based] upon the kind of reason that this Court could say is logical. This Court did allow the jury to go ahead and hear this matter. I probably, on reflection, should not have allowed certain testimony in.

> But my job is not to be sympathetic to one side or the other in a sense of ruling ... my job is to follow the law....

> And when I follow the law in this matter, I cannot intellectually and honestly say that the Plaintiffs have presented sufficient evidence that a reasonably prudent person sitting as a juror could come to the conclusion that there is sufficient evidence in the record to render the verdict that they rendered. And that's my opinion as the 13th juror.

Under *Love* and *Palanki, supra,* our first inquiry is "simply to ascertain whether the trial judge's actions in increasing or decreasing a verdict were justified, giving due credit to the jury's decision on the credibility of the witnesses and that of the trial judge in his or her capacity as thirteenth juror." *See*

*also Burlison v. Rose,* 701 S.W.2d 609, 611 (Tenn.1985) (citing *Foster v. Amcon Int'l, Inc.,* 621 S.W.2d 142, 145 (Tenn.1981)). While the amount of the verdict is primarily for the jury to determine, the trial judge who presided at the trial and heard the evidence is the next most competent person to pass upon the matter. *Id.* (citing *Transports, Inc. v. Perry,* 220 Tenn. 57, 414 S.W.2d 1, 5 (1967)). In short, we must first review the trial court's motives for reducing this verdict and whether those motives are supported by the record. As set out above, the trial court concluded that there was insufficient evidence to support any finding of loss of earnings, either past or future, and that the jury's award of those damages was based purely upon sympathy and passion. In fact, in its order, *supra,* the trial court opines that the issue of loss of earnings should never have reached the jury. Our first inquiry, therefore, is whether the evidence preponderates in favor of the trial court's finding that there was insufficient evidence to establish that Mrs. Oglesby actually suffered any loss of earnings. Before reviewing the evidence, we first pause to discuss the applicable law on loss of earning capacity.

**\*6** As set out in 29 Am.Jur.3d *Proof of Lost Earning Capacity* § 6 (1995):

> Assuming the plaintiff has established the foundation case for liability against the tortfeasor, the elements of proof necessary to establish the claim for loss of earning capacity as an element of damage are as follows:

> 1. Proof of the existence of some earning capacity-either actual or potential-prior to the injury;

> 2. Proof that this earning capacity has been lost or diminished;

> 3. Proof that the cause of the lost or diminished earning capacity is proximately caused by the injury; and

> 4. Proof of the dollar amount of the loss.

*Id.* (footnotes omitted)

Concerning the element of proximate cause, 29 Am.Jur.3d *Proof of Lost Earning Capacity* § 11 (1995) cautions:

> Usually there is little or no difference in the proof necessary to establish the case for damages generally and the elements necessary to establish damages for loss of earning capacity.... Sometimes, however, there is a difference, and careful analysis is required to make sure that the proof will be complete. It is essential for counsel to bear in

mind the necessity of proving two separate proximate-cause linkages in the case [of lost earning capacity]: one between the tortfeasor's actions and the injury sustained for the general case on liability, and a second, separate proximate-cause linkage between the injury sustained and the loss or impairment to the injured party's capacity to earn a living for the damage case on loss of earning capacity.

The general rule is that where the physical impairment can be objectively ascertained, and where its connection to impairment of earning capacity is obvious or ascertainable from other evidence, then separate medical testimony is not required to establish the elements of proximate cause between impairment and earning capacity....

Where, however, the physical impairment is obscure or subjective, or where the connection between the physical impairment and earning capacity is not obvious, then expert medical testimony may be essential. In such cases, there must be competent medical testimony that the physical condition suffered by the plaintiff, and which was proximately caused by the occurrence in suit, is a substantial factor in impairing the party's ability to earn. The expert witness so testifying must indicate that the opinions given are held to a reasonable degree of medical certainty (or a reasonable degree of medical probability), and that the opinions and connections are not mere speculation, conjecture or possibility. A failure to establish the link by competent testimony, to the degree of proof required, may result in the evidence being excluded, or the verdict overturned on appeal.

*Id.* (footnotes omitted).

The question of loss of earning capacity, both past and future was discussed by this Court in *Overstreet v. Shoney's Inc.,* 4 S.W.3d 694 (Tenn.Ct.App.1999). In *Overstreet,* we concluded that the plaintiff's claim for diminished earning capacity was not speculative because she was employed as a registered nurse and had demonstrated the ability to advance in the nursing profession. In so ruling, we noted that:

**\*7** The party seeking damages has the burden of proving them.... In tort cases, the proof of damages need not be exact or mathematically precise.... Rather, the proof must be as certain as the nature of the case permits and must enable the trier of fact to make a fair and reasonable assessment of the damages....

Damages may never be based on mere conjecture or speculation.... However, uncertain or speculative damages

are prohibited only when the existence, not the amount, of damages is uncertain ... Evidence required to support a claim for damages need only prove the amount of damages with reasonable certainty.

Loss or impairment of future earning capacity is an element of damages in a personal injury action.... Earning capacity refers not to actual earnings, but rather to the earnings that a person is capable of making....

The extent of an injured person's loss of earning capacity is generally arrived at by comparing what the person would have been capable of earning but for the injury with what the person is capable of earning after the injury.... If the injury is permanent this amount should be multiplied by the injured person's work life expectancy, and the result should be discounted to its present value .... [fn. 1 states that "[d]amages for impairment of earning capacity may be awarded for either permanent or temporary impairments....]

The injured party has the burden of proving his or her impairment of earning capacity damages.... In order to recover these damages, the injured person must first prove with reasonable certainty that the injury has or will impair his or her earning capacity.... Then, the injured party must introduce evidence concerning the extent of the impairment of his or her earning capacity.

The proof concerning impairment of earning capacity is, to some extent, speculative and imprecise.... However, this imprecision is not grounds for excluding the evidence....

The courts have found competent and admissible any evidence which tends to prove the injured person's present earning capacity and the probability of its increase or decrease in the future.... Thus, the courts have routinely admitted evidence concerning numerous factors, including the injured person's age, health, intelligence, capacity and ability to work, experience, training, record of employment, and future avenues of employment....

*Overstreet v. Shoney's Inc.,* 4 S.W.3d 694, 703-704 (Tenn.Ct.App.1999).

Moreover, as noted in 29 Am.Jur.3d *Proof of Lost Earning Capacity* § 5 (1995), fact finders must distinguish between impaired physical capacity and impaired earning capacity. They are not necessarily the same:

Proof of impaired physical ability is not always equivalent and therefore not always sufficient to prove impaired capacity to earn. Depending upon an individual's skill, education, training or experience, a severe physical disability may make no difference at all to one individual's capacity to earn while an otherwise trivial injury may make a significant difference to another....

**\*8** A careful analysis of the circumstances of each case is necessary. [One] cannot assume that significant physical injuries alone will be sufficient to establish an entitlement to damages for loss of earning capacity, nor should [one] overlook this element in cases of what may otherwise appear to be trivial or minor injuries.

*Id. See also Potts v. Mississippi Dept. of Transp.,* 3 So.3d 810 (Miss.Ct.App.2009) (holding that motor vehicle passenger's evidence of loss of earning capacity was speculative; therefore, she failed to establish any damages for loss of earning capacity in personal injury action in which she allegedly sustained injury to her right knee (passenger never presented any concrete evidence regarding her loss of earning capacity, and treating physician did not place any work restrictions on passenger)).

Based upon the foregoing principles, and especially in light of the *Overstreet* holding, the issue of the amount of damages is secondary to the issue of the existence of the damages, which must be caused by the underlying tort. In this case, the trial court did not reach the issue of the amount of damages because it concluded that Mrs. Oglesby failed to show the existence of any loss of earning capacity. We now turn to the record to determine whether the evidence preponderates against this finding. Because the sole issue before this Court is Mrs. Oglesby's claim for loss of past and future earning capacity, we will focus our discussion on those portions of the evidence that are relevant to this issue.

### Medical Treatment

Mrs. Oglesby was treated by Dr. Deneka for her left shoulder injury and by Dr. Sorenson for her neck injury. Dr. Deneka testified that Mrs. Oglesby reported to him, in October of 2008, that she was unable to go on trips because of the pain in her left shoulder. Dr. Deneka noted pain upon range of motion and difficulty with any sort of lifting. As of October 2008, Dr. Deneka opined that Mrs. Oglesby would have continued trouble with her left shoulder, and that she

would likely need intermittent pain injections at the site going forward. As of October 6, 2008, Dr. Deneka stated that Mrs. Oglesby had reached maximum medical improvement regarding her shoulder, and he assigned her a 5 percent permanent impairment rating as a result of the left shoulder injury. Specifically, Dr. Deneka opined that Mrs. Oglesby would have limitation with overhead lifting, and that she would probably not be able to lift more than twenty-five pounds.

Concerning Mrs. Oglesby's neck injury, after her initial visit to Dr. Sorenson in November 2007, Mrs. Oglesby did not see Dr. Sorenson again until April of 2008. At that time, Mrs. Oglesby continued to report neck pain, in addition to her shoulder pain, and informed Dr. Sorenson that she had been unable to escort trips due to the pain. Dr. Sorenson's physical examination revealed reduced cervical range of motion and pain and tenderness. Dr. Sorenson recommended additional therapy and medication. Although Dr. Sorenson explained that Mrs. Oglesby had degenerative changes in her neck, he stated that her neck had been asymptomatic before the accident. Mrs. Oglesby next saw Dr. Sorenson in the summer of 2008, when she again complained of neck pain and reduced range of motion. Dr. Sorenson gave Mrs. Oglesby a pain injection and saw her again on September 29, 2008. At that time, Dr. Sorenson recommended continued physical therapy, but opined that Mrs. Oglesby had reached her maximum medical improvement. Dr. Sorenson assigned Mrs. Oglesby a 5 percent permanent impairment rating as a result of her neck injury. Mrs. Oglesby saw Dr. Sorenson again on December 1, 2008, and he performed another injection at that time.

**\*9** Dr. Sorenson testified that Mrs. Oglesby should perform physical activities as tolerated, but noted that strenuous activities would likely aggravate her neck pain. Specifically, Dr. Sorenson opined that bending the neck back to look up, and any type of lifting (especially overhead), would aggravate her neck. Dr. Sorenson stated that Mrs. Oglesby would more likely than not continue to need anti-inflammatories.

Although both Dr. Deneka and Dr. Sorenson were aware that Mrs. Oglesby traveled extensively in connection with her job at Gulliver's Travel, neither doctor restricted Mrs. Oglesby from traveling, either during her treatment or after her release from their respective care. In addition, although both doctors opined that Mrs. Oglesby suffered a five percent permanent impairment, the jury did not agree because it found zero permanent impairment and awarded no damages on that claim. We note, however, that the principle

underlying recovery for lost earning capacity is the same whether the impairment is permanent or only temporary. *See Dingus v. Cain,* 406 S.W.2d 169, 171 (Tenn.Ct.App.1966); *Southern Coach Lines, Inc. v. Wilson,* 214 S.W.2d 55, 56 (Tenn.Ct.App.1948).

### The Effect of Mrs. Oglesby's Injuries on her Ability to Perform her Job

At trial, Mrs. Oglesby testified that she was still experiencing pain in her neck and left shoulder. She described the pain as "chronic," and stated that she uses pain patches and over-the-counter medication to deal with the pain. Mrs. Oglesby, and her husband, testified that, prior to the accident, Mrs. Oglesby had been very physically active, both in her personal and professional life. At the trial, Mrs. Oglesby asserted that she sustained a loss of income as a result of the accident. As noted above, her job with Gulliver's Travel is to plan, sell, and lead group travel all over the world. Mrs. Oglesby asserts that, because of the accident, she is unable to take as many group trips as she did before the accident, and that trips not taken equal missed sales opportunities, as well as additional business expenses, and, consequently, loss of income. The record, however, fails to support this claim.

Mrs. Oglesby specializes in group travel. Before the accident, she averaged five to eight trips per calendar year. After the accident, she allegedly averaged three trips per calendar year. However, the record indicates that, in the twelve months immediately following the accident, from April 2007 through March 2008, Mrs. Oglesby actually took six trips: (1) China (April 2007, eight days); (2) Russia (June 2007, eleven days); (3) Egypt (September 2007, nine days); (4) Thailand (October 2007, eleven days); (5) South Africa (January 2008, twelve days), and (6) South America (March 2008, thirteen days). Of these six trips, Mrs. Oglesby only required an assistant for the first trip to China. Linda Blaydes, a Gulliver's Travel agent, testified that she accompanied Mrs. Oglesby on the China trip. Although Mrs. Oglesby claims that the inclusion of Ms. Blaydes in this trip resulted in loss of income to the business (and to Mrs. Oglesby as a part-owner), the record indicates that, at the time of the China trip, Ms. Blaydes was in training to sell group trips, and was beginning to travel with groups. Moreover, Ms. Blaydes testified that Mrs. Oglesby allegedly missed two trips after the accident, one to Budapest, and another "wine cruise" from Vancouver to San Diego. One of Mrs. Oglesby's theories at trial was that Gulliver's Travel had lost repeat business because Mrs. Oglesby was unable to sell upcoming trips while traveling with loyal clientele. Mrs. Oglesby testified that, anytime she goes on a trip with a group, she arranges a cocktail hour so that she can talk about upcoming trips and, hopefully, obtain commitments for these upcoming ventures from the travelers at that time. However, when asked whether Gulliver's Travel had lost any business in relation to these missed trips, neither Ms. Blaydes, nor Mrs. Oglesby could elaborate. Moreover, there was no testimony introduced from any client who had declined to schedule travel through the agency because Mrs. Oglesby could not travel. Although the record indicates that Mrs. Oglesby took six trips (or approximately the same number of trips that she took pre-accident) in the year after her accident, the jury found that Mrs. Oglesby's ability to travel had been limited, to some degree, by her injuries. This finding appears to be the basis for the jury's award of damages for loss of earning capacity in this case. Specifically, the jury found that, if Mrs. Oglesby's ability to travel was affected, then her ability to sell was, likewise, affected. However, as discussed below, it is not the number of trips, or even the number of sales, that reflect Mrs. Oglesby's true earnings; rather, it is the amount of the commissions paid on those sales.

**\*10** Mrs. Oglesby is one of several travel agents that work for Gulliver's Travel. Gulliver's Travel earns income through receipt of commissions paid by its vendors (i.e., hotels, airlines, tour group operators, etc.) and clients. Some of the agents are paid hourly rates plus a percentage of the commissions earned, while other agents are paid only a percentage of the commissions earned. It is important to note that Mrs. Oglesby is neither paid by the hour, nor paid a direct percentage of the commissions on her personal sales. As part-owner of Gulliver's Travel Poplar Avenue, Mrs. Oglesby's income is tied to the profits and losses of both retail locations. At trial, Mrs. Oglesby explained the payment structure as follows:

Q. Would you agree with me, Mrs. Oglesby, that your personal income, as a whole, is directly tied to Gulliver's Travel, both locations, rather than just your own personal commissions?

A. My personal commissions goes-is in the whole company. Right.

* * *

Q. So your personal income is tied to the business as a whole?

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

A. Correct.

* * *

Q. And you don't get a direct dollar, dollar percentage commission on every trip you sell because it goes back into the whole, correct?

A. Absolutely. Correct.

Although there was testimony that, in some years, Mrs. Oglesby received a salary from Gulliver's Travel, she did not draw a salary if the company profits did not provide the necessary income. For example, in 2009, Gulliver's Travel did not make enough profit for Mrs. Oglesby to receive her salary. In fact, she testified that she made a decision not to take a full salary so that the company would not have to lay off any of its agents. Although Mrs. Oglesby's overall earnings necessarily decreased based upon her decision to forego her draw (i.e., her salary is essentially a draw against anticipated profits of the business, and is based upon her 50 percent ownership interest in the holding company), this decrease was not, from the record, a direct result of Mrs. Oglesby's inability to work. Rather, the record reveals that numerous factors affect Gulliver's Travel and its ability to make a profit. As the

testimony reveals, these factors include, but are not limited to, the economy, increased expenses, decreased commissions paid by vendors, the productivity of its agents, competition, and the increased use of internet travel sites. In her testimony, Mrs. Oglesby conceded that these, and other factors, play a substantial role in the revenues and profits of Gulliver's Travel. Todd Bagatelas, one of Mrs. Oglesby's partners and the accountant for the agency, also testified that the foregoing factors have affected the company's overall profits.

The car accident occurred on April 12, 2007. Because Gulliver's Travel's trips are generally booked and paid in advance, the year 2007 was typical for Mrs. Oglesby and for Gulliver's Travel. We note that the fiscal year for Gulliver's Travel runs from October 1 to September 30. A comparison of the company's fiscal years for 2007, 2008, and 2009 was prepared by Mr. Riggins' accounting expert, Dr. Parker Cashdollar, and was introduced at trial as Exhibit 22. The following information combines the figures for both retail locations, and provides as follows:

### TOTAL SALES AND COMMISSIONS OF GULLIVER'S TRAVEL

|  | *2007* | *2008* | *2009* |
|---|---|---|---|
| Sales | $7,053,677 | $5,482,071 | $4,353,981 |
| Commissions | $826,638 | $679,836 | $547,866 |

**\*11** The testimony at trial also revealed that the total number of travel agents working at Gulliver's Travel decreased over these years. In 2007, there were thirty-six agents working; in 2008, there were twenty-eight agents; and in 2009, there were twenty-seven. Consequently, and according to Dr. Cashdollar's calculations, from 2007 to 2009, Gulliver's Travel's total sales to clients decreased by $2,699,696 (or approximately 38 percent). The total revenue from commissions earned by Gulliver's Travel decreased by $278,772 (or approximately 34 percent), and the number of sales agents generating income decreased by nine (or 25 percent). Obviously, the overall profits of Gulliver's Travel decreased during these years. Mrs. Oglesby contends that

these decreases show a loss of earnings. While we concede that the decrease in overall income of Gulliver's Travel necessarily affects Mrs. Oglesby's income as a 50 percent owner of the company, the issue is whether this decrease in overall income was a result of Mrs. Oglesby's inability to generate her usual sales, commissions, and income because of injuries sustained in the car accident. The answer hinges upon the evidence introduced regarding Mrs. Oglesby's personal sales and commissions during the relevant time period.

Trial Exhibit 22 sets out Mrs. Oglesby's sales and commissions during the 2007 through 2009 fiscal years:

|  | *2007* | *2008* | *2009* |
|---|---|---|---|
| Jan Oglesby's Sales | $615,440 | $457,869 | $384,669 |
| Jan Oglesby's Commissions | $78,140 | $82,052 | $79,424 |

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

As set out above, Mrs. Oglesby's overall sales decreased by approximately 37 percent from 2007 to 2009. This is consistent with the decrease in overall sales at Gulliver's Travel of approximately 38 percent. However, it is her commissions that provide income to the business. As noted above, Mrs. Oglesby's commissions actually remained steady (and, in fact, increased slightly) over the relevant time period. Again, it is undisputed that overall company sales were affected by various factors during the years 2007 through 2009. As a result of the decrease in the profits of Gulliver's Travel, Mrs. Oglesby's income did decline dramatically from 2007 to 2009, both in absolute amounts and as a percentage of personal commissions earned. Specifically, in 2007, Mrs. Oglesby's income was $101,000 (or 129.26 percent of her total commissions); in 2008 her income was $64,081 (or 78.10 percent of her total commissions), and in 2009 (the year in which Mrs. Oglesby chose to forego her full salary in order to retain her employees) her income was $15,385 (or 19.37 percent of her total commissions). However, based upon the fact, as set out in Trial Exhibit 22, *supra*, that Mrs. Oglesby's commissions remained steady, despite the overall decline in the company's profits, we are unable to conclude that there is any direct or substantial correlation between the commissions she personally generated for Gulliver's Travel and her decreased income derived from the business as a whole.

**\*12** At the hearing, Mrs. Oglesby did not testify concerning her own personal loss of earning capacity claim. Rather, she relied upon her husband, John Oglesby, to calculate her alleged loss. Mr. Oglesby testified that a direct correlation exists between Mrs. Oglesby's commissions earned and her personal income. Mr. Oglesby's testimony appears to rest upon the proposition that Mrs. Oglesby receives 50 percent (as part-owner) of every dollar she receives in commission. As stated in the Oglesbys' brief:

> After expenses are deducted, for every $100 generated on these trips, Mrs. Oglesby would receive $50. Thus, the three trips [per year] that Mrs. Oglesby will [allegedly] miss going forward results in a 50 percent loss of income [per trip] to Mrs. Oglesby....

This proposition, however, is not supported by the record. As discussed above, Mrs. Oglesby does not, necessarily, receive 50 percent of her own commissions; rather, her income is derived from the total commissions and profits (minus expenses) generated by Gulliver's Travel Poplar Avenue (which amount hinges upon the overall performance of both retail locations). So, for example, in 2009, although Mrs. Oglesby's commissions were in line with previous years, she did not draw a salary in order to avoid terminating employees. Consequently, she was not generating commissions as income for herself, but to keep her agents employed and the business open. In her testimony, Mrs. Oglesby admitted that her commissions go into the whole business along with the commissions of the other employees. Mr. Bagatelas confirmed that Mrs. Oglesby receives a share of the overall profits.

Mrs. Oglesby allegedly lost commissions by being unable to travel and, therefore, being unable to sell future vacations while on her current trips, and this is what the jury found. However, from the number of trips Mrs. Oglesby took in the year following the accident, it does not appear that Mrs. Oglesby was rendered unable to travel by her injuries. Rather, the evidence establishes that Mrs. Oglesby can and does, in fact, travel. Concerning her ability to sell future trips while on current trips, Mrs. Oglesby admitted that she can and does sell group travel after the accident. Moreover, no customer testified that he or she did not take or book a trip because Mrs. Oglesby was unable to lead the trip after her accident. Consequently, there is no competent evidence, medical or otherwise, to show that Mrs. Oglesby cannot travel or otherwise sell group travel trips after the accident. Although Mrs. Oglesby may not have traveled as frequently in the calendar years following the accident, the record does not show a causal relationship between this fact and the accident. Rather, the decline in overall sales is consistent with the decline in the business as a whole. And, more importantly, Mrs. Oglesby's commissions remained steady despite the overall decline in the travel business.

Based upon the record as a whole, we conclude that the trial court did not err in finding that Mrs. Oglesby failed to meet her burden to show a meritorious loss of earning capacity claim for either past or future lost earnings. We, therefore, do not reach the question of the amount of damages.

**\*13** For the foregoing reasons, we affirm the order of the trial court. Costs of this appeal are assessed against the Appellants, Jan Oglesby and John Oglesby, and their surety.

Footnotes

1    Although Mr. Oglesby is listed as an Appellant on the Notice of Appeal, we note that he has raised no issue concerning his loss of consortium claim.

2    The record indicates that, prior to the accident, Mrs. Oglesby had undergone surgery on her right rotator cuff, and had also had carpal tunnel surgery.

3    We note that the trial court's suggestion of remittitur in this case did not "totally destroy" the jury's verdict. Rather, after remittitur of the loss of earning capacity awards, the jury's verdict was reduced to $57,626.35, plus discretionary costs. Mr. Oglesby's award for loss of consortium was also undisturbed. At oral argument, Ms. Oglesby's attorney stated that she was not raising an appellate issue concerning whether the trial court's suggestion of remittitur destroyed the jury's verdict.

---

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT E

```
 1          IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                    AT NASHVILLE

 3   CARL ADAMS,              )
                              )
 4          Plaintiff,        )
                              )
 5   vs.                      ) NO. 3:13-cv-01449
                              )
 6   JOHN DOE and M.P. EXPRESS,)
     INC.,                    )
 7                            )
            Defendants.       )
 8   -------------------------)

 9

10

11

12        Deposition of:

13        CARL ADAMS

14        Taken on behalf of the Defendants

15        September 4, 2014

16

17

18

19

20

21

22   ---------------------------------------------
                VOWELL, JENNINGS & HUSEBY
23           Court Reporting Services
                207 Washington Square
24            214 Second Avenue North
             Nashville, Tennessee  37201
25                 (615) 256-1935
```

**Vowell, Jennings & Huseby**          **www.vowelljennings.com**
**214 2nd Ave., Suite 207, Nashville, TN 37201**          **(800) 641-9390**
Case 3:13-cv-01449   Document 30-2   Filed 12/03/14   Page 40 of 71 PageID #: 171

1  Q.      Did you require any assistance to get

2  out of the truck following the accident?

3  A.      No.

4  Q.      And your truck was not towed away from

5  any accident scene, correct?

6  A.      No, ma'am.

7  Q.      Is it fair to say that any damages to

8  your truck weren't significant enough to

9  impair your ability to continue driving the

10  truck?

11  A.      That's fair.

12  Q.      And is it fair to say that damages to

13  your truck were not significant enough to

14  impair your ability to enter and exit the

15  truck, correct?

16  A.      Correct.

17  Q.      Were you transported to the hospital

18  via ambulance at any time as a result of the

19  September 9th, 2013, accident?

20  A.      No, ma'am.

21  Q.      Did you sustain any physical injuries

22  as a result of the September 9th, 2013,

23  accident?

24  A.      Yes, ma'am.

25  Q.      Can you explain your injuries?

Vowell, Jennings & Huseby          www.vowelljennings.com
214 2nd Ave., Suite 207, Nashville, TN 37201          (800) 641-9390
Case 3:13-cv-01449  Document 30-2  Filed 12/03/14  Page 41 of 71 PageID #: 172

**CARL ADAMS vs. JOHN DOE and M.P. EXPRESS, INC.**
**Carl Adams on 09/04/2014**

Page 50

1  A.      It was in my back.

2  Q.      Okay.  What kind of injury did your

3  back sustain as a result of the accident?

4  A.      The L4 area, I think is what the

5  doctor told me, had been damaged and ruptured.

6  Q.      When did you first experience pain

7  following the accident?  Was it immediate?

8  A.      No.  It was minutes afterwards.  And

9  it was at the point to where I started to calm

10  down and when I turned around is when I first

11  noticed it.

12  Q.      So you followed the tractor-trailer

13  into Kentucky?

14  A.      Yes, ma'am.

15  Q.      Are you saying that you began to feel

16  your pain once you turned around and maybe the

17  adrenaline stopped flowing?

18  A.      Yes, ma'am.

19  Q.      So within 30 minutes following the

20  accident you experienced pain?

21  A.      Approximately, yes.

22  Q.      Was it severe?

23  A.      Yes.  It was painful.

24  Q.      One a scale of one to ten, ten being

25  the most severe, how severe was your pain

**Vowell, Jennings & Huseby**      www.vowelljennings.com
**214 2nd Ave., Suite 207, Nashville, TN 37201**
**(800) 641-9390**

Case 3:13-cv-01449   Document 30-2   Filed 12/03/14   Page 42 of 71 PageID #: 173

1  Q.      More than a thousand?

2  A.      I don't know.  I really don't.

3  Q.      What future medical expenses are you

4  referring to when you say you are seeking

5  damages for future medical expenses?

6  A.      Well, the next step if I have any

7  trouble would be another surgery or a

8  procedure or whatever the correct term would

9  be.

10  Q.      Has a physician informed you that you

11  will in fact need another surgery as a result

12  of this accident?

13  A.      Not definitely, but it is possible.

14  Q.      Is it fair to say no physician has

15  told you you are going to require another

16  surgery as a result of this accident?

17  A.      That I don't know.

18  Q.      Has a physician ever told you you are

19  in fact going to require another surgery as a

20  result of this accident?

21  A.      Not definitely.  No, they have not.

22  Q.      Has a physician -- any medical

23  provider told you that you are going to

24  require any medical treatment, surgery or

25  otherwise, in the future as a result of this?

**Vowell, Jennings & Huseby**        www.vowelljennings.com
**214 2nd Ave., Suite 207, Nashville, TN 37201**
**(800) 641-9390**
Case 3:13-cv-01449   Document 30-2   Filed 12/03/14   Page 43 of 71 PageID #: 174

**CARL ADAMS vs. JOHN DOE and M.P. EXPRESS, INC.**
**Carl Adams on 09/04/2014**

Page 58

1  A.      In the future?  No, ma'am.

2  Q.      So your complaint seeks damages for

3  future medical expenses but in fact no health

4  care provider has told you you are going to

5  need future medical care, correct?

6  A.      Not definitely.  It is possible.  That

7  was told to me.

8  Q.      Your discovery responses also indicate

9  you're seeking damages for lost wages and

10  earning capacity.  I want to talk to you a

11  little bit about that.  You were working at

12  the time of the accident, correct?

13  A.      Yes, ma'am.

14  Q.      And I think you testified earlier that

15  you work between 48 hours and 36 hours

16  depending on the week, correct?

17  A.      That's what's scheduled.

18  Q.      Is that how much you were working at

19  the time of the accident?  One of those weeks,

20  the 48 --

21  A.      Yeah.  I mean, I'd have to look back,

22  go back to count to tell you.

23  Q.      But you were working full time?

24  A.      Yes.

25  Q.      Were your wages the same at the time

**Vowell, Jennings & Huseby**       www.vowelljennings.com
**214 2nd Ave., Suite 207, Nashville, TN 37201**       **(800) 641-9390**
Case 3:13-cv-01449  Document 30-2  Filed 12/03/14  Page 44 of 71 PageID #: 175

**CARL ADAMS vs. JOHN DOE and M.P. EXPRESS, INC.**
**Carl Adams on 09/04/2014**

Page 68

1  Q.      Your discovery responses also indicate

2  you're seeking damages for permanent

3  impairment as a result of the accident.

4  Explain your permanent impairment.

5  A.      The things that I used to do, I cannot

6  do.  I still have trouble putting a pair of

7  shoes on, putting underwear on, pants.

8  Sitting for a long period of time.  I've yet

9  to lift anything that's substantial weight or

10 whatever.  I've still stayed 50 pounds or

11 less.

12 Q.      Are you referring to pain in your back

13 that prevents you from doing these things?

14 A.      Yes.

15 Q.      Okay.  Has a physician ever told you

16 that you are permanently impaired as a result

17 of the September 9th, 2013, accident?

18 A.      No.

19 Q.      Has any other medical provider ever

20 told you that you are permanently impaired as

21 a result of this September 9, 2013, accident?

22 A.      No, ma'am.

23 Q.      And your discovery responses indicate

24 you're seeking damages for loss of enjoyment

25 of life.  This might be a legal phrase that

**Vowell, Jennings & Huseby**          www.vowelljennings.com
**214 2nd Ave., Suite 207, Nashville, TN 37201**
**(800) 641-9390**

Case 3:13-cv-01449  Document 30-2  Filed 12/03/14  Page 45 of 71 PageID #: 176

1  that what you're saying?

2  Q.     I think there's a two-day difference.

3  I think the progress note indicates September

4  16th and this indicates the 18th.  So you'd

5  agree that 9/18/13 is approximately one week

6  following the accident, correct?  Or nine

7  days?

8  A.     Yeah.  Nine days.

9  Q.     Okay.  But you don't recall filling

10 out this questionnaire?

11 A.     No, I do not.

12 Q.     But it is your handwriting?

13 A.     It appears to be.

14 Q.     Okay.  Now, on the first page under

15 medical history, do you see that section?

16 A.     Yes.

17 Q.     It indicates -- what does it state?

18 A.     It says Chief Complaint:  Why are you

19 here today?  Date symptoms began:  Seven to

20 eight years ago.

21 Q.     Does it state more?

22 A.     Yeah.  But that's not my handwriting.

23 Q.     Okay.  What does it state next?

24 A.     It says low back pain.

25 Q.     Okay.  But the symptoms began seven to

Vowell, Jennings & Huseby          www.vowelljennings.com
214 2nd Ave., Suite 207, Nashville, TN 37201
(800) 641-9390
Case 3:13-cv-01449   Document 30-2   Filed 12/03/14   Page 46 of 71 PageID #: 177

1  eight years ago, is that your handwriting?

2  A.      Correct.

3  Q.      A minute ago you testified didn't have

4  any back pain prior to the accident in

5  September 2013, correct?

6  A.      Correct.

7  Q.      But this form indicates that you told

8  the doctor in September that you had had pain

9  for seven to eight years, correct?

10  A.      That's what this reads.

11  Q.      Do you have any reason to dispute this

12  record?

13  A.      This report?

14  Q.      Correct.

15  A.      No.

16  Q.      That is your handwriting?

17  A.      It appears to be my handwriting.

18  Q.      And the date of this form is nine days

19  post accident, correct?

20  A.      Yes.

21          MR. WOODARD: I object to that

22  question about what he said about his prior

23  back pain.

24          MS. OLSON:  Based on?

25          MR. WOODARD:  I don't think he's

Vowell, Jennings & Huseby            www.vowelljennings.com
214 2nd Ave., Suite 207, Nashville, TN 37201        (800) 641-9390
Case 3:13-cv-01449  Document 30-2  Filed 12/03/14  Page 47 of 71 PageID #: 178

1  A.      That's what this reads.

2  Q.      And then it refers to low back pain,

3  but that's not your writing you state,

4  correct?

5  A.      That's what I believe to be true.

6  Q.      Okay.  In the next section it

7  indicates says you have treated, correct?

8  A.      It says have you been treated with any

9  of the following.

10  Q.      Is physical therapy checked?

11  A.      Yes.

12  Q.      Anti-inflammatories checked?

13  A.      Yes.

14  Q.      And a chiropractor, that's checked as

15  well, correct?

16  A.      Yes.

17  Q.      Exercise programs?

18  A.      Yes.

19  Q.      Pain medication?

20  A.      Yes.

21  Q.      And is epidural steroid injection

22  checked?

23  A.      Yes.

24  Q.      And what do you indicate?  How many

25  epidural steroid injections had you received

**Vowell, Jennings & Huseby**          **www.vowelljennings.com**
**214 2nd Ave., Suite 207, Nashville, TN 37201**          **(800) 641-9390**
Case 3:13-cv-01449  Document 30-2  Filed 12/03/14  Page 48 of 71 PageID #: 179

1  prior to September 2013?

2  A.      I see 30.

3  Q.      Okay.  But a moment ago you testified

4  having never remembered receiving an epidural

5  injection, correct?

6  A.      I said I do not recall.

7  Q.      You don't recall receiving over 30

8  epidural spinal injections?  You don't recall

9  any of those?

10  A.      That's correct.

11  Q.      Okay.  And then it indicates below

12  that -- is that your handwriting below?

13  A.      It appears to be.

14  Q.      And what does it state?

15  A.      All have helped to different levels

16  and for different periods of time.

17  Q.      If you turn to the last page of the

18  questionnaire, it's marked at the bottom MP

19  EXPRESS 75.  Are you there?

20  A.      Yes.

21  Q.      It indicates in the middle of the page

22  the date you last worked, correct?

23  A.      Let's see.  Yes.

24  Q.      And what does it indicate the date you

25  last worked?

**Vowell, Jennings & Huseby**          www.vowelljennings.com
**214 2nd Ave., Suite 207, Nashville, TN 37201**
**(800) 641-9390**
Case 3:13-cv-01449   Document 30-2   Filed 12/03/14   Page 49 of 71 PageID #: 180

1  A.      It says 9/12/13.

2  Q.      Okay.  And you had testified

3  previously that you worked the week of the

4  accident, right?

5  A.      Correct.

6  Q.      Then there's a question just

7  underneath that two lines down.  Does it

8  indicate:  Was this illness/injury caused by

9  an automobile accident?  Do you see that

10  question?

11  A.      Yes, I see the question.

12  Q.      And how did you respond to that

13  question?

14  A.      It's checked no.

15  Q.      And the next line down asked if there

16  was another party responsible for the

17  accident, correct?

18  A.      Correct.

19  Q.      And how did you respond to that

20  question?

21  A.      It's checked no.

22  Q.      So just so I'm clear, one week

23  following your September 9th, 2013, accident

24  you completed this health questionnaire for

25  the lower back pain you were experiencing and

Vowell, Jennings & Huseby          www.vowelljennings.com
214 2nd Ave., Suite 207, Nashville, TN 37201
(800) 641-9390
Case 3:13-cv-01449  Document 30-2  Filed 12/03/14  Page 50 of 71 PageID #: 181

1  records?

2  A.      Some I may.  I just disagreed with

3  one.

4  Q.      Did you keep a diary or a journal or

5  make any notes or anything related to this

6  accident?

7  A.      No, ma'am.

8          MS. OLSON:  I'm just about done,

9  so if I can just review my notes for a

10  second.

11          MR. WOODARD:  Let me know whenever

12  it's okay with you for me to meet with my

13  client.

14  BY MS. OLSON:

15  Q.      So you don't recall any spinal

16  injections, correct, prior to the accident?

17  A.      I don't recall that.

18  Q.      If your medical records indicate you

19  had an epidural spinal steroid injection on

20  August 26, 2013, two weeks prior to your

21  accident, do you have any reason to dispute

22  the accuracy of those records?

23  A.      If that's what it shows.  If that's

24  what I read or read.

25  Q.      And you had -- if your records show

**Vowell, Jennings & Huseby**          **www.vowelljennings.com**
**214 2nd Ave., Suite 207, Nashville, TN 37201**
**(800) 641-9390**
Case 3:13-cv-01449  Document 30-2  Filed 12/03/14  Page 51 of 71 PageID #: 182

1  that you had another epidural injection on

2  July 10th, 2013, you don't remember that one

3  either?

4  A.      No, I don't.

5  Q.      And if the records show you had

6  another injection on May 6, 2013, you don't

7  remember that injection either?

8  A.      No, ma'am.

9  Q.      And if the records show you had

10 another injection on March 6, 2013, you don't

11 remember that one either?

12 A.      I do not recall that.

13 Q.      If the records show you had another

14 injection on October 25, 2012, you don't

15 remember that one either?

16 A.      I don't recall that.

17         MS. OLSON:  Let's go ahead and

18 mark this.  I'm almost done.  I promise.

19         (Marked Exhibit No. 8.)

20 BY MS. OLSON:

21 Q.      I'm going to pass you a medical record

22 we received from Premium Radiology Pain

23 Management Center.  Is that your name at the

24 top of that page?  See where it says patient

25 name?

**Vowell, Jennings & Huseby**          www.vowelljennings.com
**214 2nd Ave., Suite 207, Nashville, TN 37201**          **(800) 641-9390**
Case 3:13-cv-01449   Document 30-2   Filed 12/03/14   Page 52 of 71 PageID #: 183

1  A.      Yes.  It appears to be.

2  Q.      And I don't want to repeat it, but

3  your social security number, is that your

4  social security number on this record?

5  A.      No.

6  Q.      That's not your social security

7  number?

8  A.      No.  Can I ask a question?  Why would

9  that be on a medical record?

10  Q.      I think that's actually why those

11  numbers look odd.  I think it's because it's

12  -- are those the last four digits of your

13  social security number?

14  A.      Yes.

15  Q.      I think the nines on there are to

16  block it out.

17          Is that your date of birth?

18  A.      Yes.

19  Q.      And looking a few lines down, what

20  does it indicate as the exam date?

21  A.      8/26/2013.

22  Q.      And if you look under the line, what

23  does it indicate as the procedure that was

24  performed?

25  A.      Where does it say procedure?

Vowell, Jennings & Huseby          www.vowelljennings.com
214 2nd Ave., Suite 207, Nashville, TN 37201
(800) 641-9390
Case 3:13-cv-01449  Document 30-2  Filed 12/03/14  Page 53 of 71 PageID #: 184

1  Fluoroscopic guided lumbar epidural steroid

2  injection, CPT 62311, 77003.

3  Q.       So this record indicates you had a

4  lumbar epidural steroid injection on August

5  26, 2013, correct?

6  A.       That's what this says.

7  Q.       And that's just about just two weeks

8  prior to your accident, isn't that correct?

9  A.       Yes.  Datewise, it is.

10  Q.       Do you have any reason to dispute the

11  accuracy of that record you're looking at?

12  A.       No.  It's what I read.

13  Q.       I'll represent to you that we obtained

14  all the records from Premier Radiology and it

15  indicates you had the same procedure

16  performed, lumbar epidural steroid injections,

17  on October 25, 2012.  Do you have any reason

18  to dispute those records?

19  A.       I don't recall.

20  Q.       Do you have any reason to -- would you

21  like to look at them?

22  A.       Sure.

23  Q.       And I apologize, I don't have extra

24  copies.  But this page has been marked MP

25  EXPRESS 1046 and it indicates your name at the

**Vowell, Jennings & Huseby**          www.vowelljennings.com
**214 2nd Ave., Suite 207, Nashville, TN 37201**          (800) 641-9390
Case 3:13-cv-01449  Document 30-2  Filed 12/03/14  Page 54 of 71 PageID #: 185

1  top, the procedure is fluoroscopic guided

2  lumbar epidural steroid injection.  Does that

3  indicate an injection was performed on October

4  25th, 2012?  Excuse me.  That a lumbar

5  epidural steroid injection was performed on

6  you on October 25th, 2012?

7  A.      Yes.  That's what this reads.

8  Q.      Any reason to dispute that record?

9  A.      No.  That's what I'm reading.

10 Q.      Okay.  I'm going to pass you another

11 page from Premier Radiology Pain Management

12 Center Bates stamped MP EXPRESS 1048.  As

13 you'll see, it has your name on the top, your

14 date of birth and indicates the procedure

15 fluoroscopic guided lumbar epidural steroid

16 injection and the exam date being March 6,

17 2013.  Do you see that information on that

18 document I just passed you?

19 A.      Yes.

20 Q.      Do you have any reason to dispute the

21 information in that record?

22 A.      It's what I'm reading.

23 Q.      Any reason to dispute it?

24 A.      I mean, I'm reading it.  I see it

25 plain as day.

Vowell, Jennings & Huseby          www.vowelljennings.com
214 2nd Ave., Suite 207, Nashville, TN 37201
(800) 641-9390
Case 3:13-cv-01449  Document 30-2  Filed 12/03/14  Page 55 of 71 PageID #: 186

1  Q.      Do you see anything in there that

2  appears inaccurate to you?

3  A.      I haven't read the whole thing.

4  Q.      Please do if you need to do that.

5          Are you finished?

6  A.      Yeah.

7  Q.      Any reason to dispute anything in that

8  medical record?

9  A.      No.

10  Q.      I'll pass you another record from

11  Premier Radiology Pain Management Center dated

12  exam date May 6, 2013, with your name at the

13  top indicating the procedure as fluoroscopic

14  guided lumbar epidural steroid injection

15  indicating the injection was performed on May

16  6, 2013.  Do you have any reason to dispute

17  the accuracy of that record?

18  A.      No.

19  Q.      And I'll pass you one more record from

20  Premier Radiology, exam date July 10th, 2013,

21  your name at the top indicating the procedure

22  fluoroscopic guided lumbar epidural steroid

23  injection.  Do you have any reason to dispute

24  the accuracy of that record?

25  A.      No.  It appears to be me.

**Vowell, Jennings & Huseby**        **www.vowelljennings.com**
**214 2nd Ave., Suite 207, Nashville, TN 37201**
**(800) 641-9390**

Case 3:13-cv-01449  Document 30-2  Filed 12/03/14  Page 56 of 71 PageID #: 187

1          MS. OLSON:  If we could mark that

2  as a collective exhibit.

3              (Marked Exhibit No. 9.)

4  BY MS. OLSON:

5  Q.      So you would agree that prior to your

6  accident in September 2013 you had at least

7  four epidural steroid injections in 2013 due

8  to back pain; is that correct?

9  A.      I don't recall that.

10  Q.      You don't recall having any epidural

11  injections?

12  A.      I don't recall that.

13  Q.      But you have no reason to dispute your

14  records that reflect that, isn't that correct?

15  A.      I read that.  That's my information.

16  Q.      Are you currently receiving physical

17  therapy?

18  A.      I have a home workbook.

19  Q.      To just do things at home to help

20  improve?

21  A.      (Nods head up and down.)

22  Q.      Are you compliant with your home

23  workbook?

24  A.      Most of the time.

25  Q.      And where did you obtain the workbook?

**Vowell, Jennings & Huseby**        www.vowelljennings.com
**214 2nd Ave., Suite 207, Nashville, TN 37201**    **(800) 641-9390**
Case 3:13-cv-01449  Document 30-2  Filed 12/03/14  Page 57 of 71 PageID #: 188

1  A.      Dr. McCombs.

2  Q.      Any other eyewitnesses to the accident

3  other than you, the tractor-trailer driver and

4  your passenger, Jerry Buchanan?

5  A.      No, ma'am.

6  Q.      Do you have any written statements

7  other than the traffic crash report that

8  reflect or document the accident in any way?

9  A.      No, ma'am.

10              MS. OLSON:  That's all I have.

11              MR. WOODARD:  We'll take a quick

12  break.  Will you put that on the record?

13              (Brief recess observed.)

14              MS. OLSON:  If you don't mind

15  before you start -- did we check these

16  exhibits?

17              THE COURT REPORTER:  No.  Did you

18  want to do it now or --

19              MS. OLSON:  We'll check them

20  afterwards.  Just so I can state on the

21  record, there's two exhibits, Howell Allen MP

22  EXPRESS 103 and MP EXPRESS 50.  We're going to

23  double-check after the fact to make sure

24  they're part of the exhibits as they should

25  be.  They were already identified.

Vowell, Jennings & Huseby          www.vowelljennings.com
214 2nd Ave., Suite 207, Nashville, TN 37201
(800) 641-9390
Case 3:13-cv-01449  Document 30-2  Filed 12/03/14  Page 58 of 71 PageID #: 189

1              And then when we went off the

2   record I think it was about 1:15 and it's now

3   1:35, so we had a 20-minute break.

4   BY MS. OLSON:

5   Q.        And I would just like to ask the

6   deponent whether he had any conversations with

7   his counsel about the deposition testimony he

8   gave today.

9   A.        Yes.

10  Q.        Okay.  And what did you discuss?

11  A.        Some clarification.

12  Q.        Is there anything that you answered

13  previously that you want to clarify for the

14  questions that I asked you?

15  A.        Well, I think it would clarify some

16  things.  I think that I was -- or maybe there

17  was a misunderstanding if you were asking me

18  like if I'm denying that I've had treatment.

19  I was under the understanding that you were

20  asking me like if I remember, and I don't

21  remember, if that makes sense.

22  Q.        Is it your testimony that you don't

23  necessarily remember the treatment that we

24  discussed previously, however you don't

25  dispute the medical records if they reflect

Vowell, Jennings & Huseby          www.vowelljennings.com
214 2nd Ave., Suite 207, Nashville, TN 37201
(800) 641-9390
Case 3:13-cv-01449  Document 30-2  Filed 12/03/14  Page 59 of 71 PageID #: 190

1  such treatment?

2  A.      Right.  When you was asking me, I was

3  like well, I don't remember, you know.  And

4  when you said 30, I was like I don't recall

5  that.

6  Q.      And you --

7  A.      Does that make sense?

8  Q.      I apologize.  It does.  I didn't mean

9  to cut you off.

10          And I just want to make sure.  You

11  don't remember -- correct me if I'm wrong.

12  But your testimony is you do not recall prior

13  to your accident having any epidural steroid

14  injections.  That's correct, right?

15  A.      No.  I've had treatment.  I thought

16  you was asking like particularly ones, if you

17  were asking me if -- and you were giving me

18  the dates or whatever if I can remember, if I

19  recall them.  And no, I do not.  Just as well

20  as when you said 30 and you looked at me and

21  smiled and you said you don't remember 30.

22  No, I don't.  I don't recall that.

23  Q.      I believe your testimony was that you

24  do not remember having any injections prior to

25  the accident.  Is that incorrect?

**Vowell, Jennings & Huseby**          www.vowelljennings.com
**214 2nd Ave., Suite 207, Nashville, TN 37201**      **(800) 641-9390**
Case 3:13-cv-01449  Document 30-2  Filed 12/03/14  Page 60 of 71 PageID #: 191

1  A.      Well, another thing.  I would say are

2  you asking me about what I had treated or are

3  you asking me about another area?  Because I

4  feel like -- and I asked him, I said I don't

5  know --

6  Q.      If that's the game we're going to

7  play, we can start over.

8  A.      I'm not playing a game.

9  Q.      We can start over.  Prior medical

10  history.  Okay?  Prior medical history.

11  A.      Could I finish talking?

12  Q.      Sure.  Go ahead.  Finish.

13  A.      What I was saying is I also do not

14  know if you were asking me about the L4

15  because I even mentioned the L4.  I even --

16  when you handed me that piece of paper,

17  whichever one it was, I said this one is

18  incorrect.  I said I've never had an injection

19  for that area or whatever we referred to it

20  as.  Do you recall that?  I'm being straight

21  with you.

22  Q.      Well, this is question and answer and

23  I ask the questions, respectfully, and you

24  give the answers.

25                  MR. WOODARD:  We're not going to

**Vowell, Jennings & Huseby**          www.vowelljennings.com
**214 2nd Ave., Suite 207, Nashville, TN 37201**          **(800) 641-9390**
Case 3:13-cv-01449   Document 30-2   Filed 12/03/14   Page 61 of 71 PageID #: 192

1   -- he's not going to answer much more today.

2   There's obviously some serious

3   miscommunication.  So we'll have to adjourn

4   and come back later, but --

5            MS. OLSON:  Well, respectfully, I

6   object to that. I'm entitled to seven hours

7   under the Federal Rules of Civil Procedure and

8   we are at hour three and a half, so I will

9   take my seven hours.  This man is under oath.

10           MR. WOODARD:  He's not going to be

11  deposed longer today if it's going to continue

12  like this.  He's being up front with you.  You

13  aren't asking questions that he understands,

14  which he's trying to tell you, and you're just

15  trying to butcher him into staying here for

16  four more hours.  I mean, he's answered rogs.

17           MS. OLSON:  No, I'm going to --

18  respectfully, I'm going to go through my

19  questions to make sure we are on the same page

20  so his testimony is accurate for the record.

21           MR. WOODARD:  He just told you, so

22  he's already answered.

23           MS. OLSON:  Actually he hasn't,

24  respectfully.

25           THE WITNESS:  I did.  I even gave

# EXHIBIT F

| | |
|---|---|
| **From:** | Tricia Olson <Tricia.Olson@arlaw.com> |
| **Sent:** | Thursday, September 11, 2014 9:33 AM |
| **To:** | blair@durhamanddread.com |
| **Cc:** | Angel Ehiemua |
| **Subject:** | Adams v. MP Express - Deposition of Dr. McCombs |

Blair,

I would like to depose Mr. Adams' treating physician at Howell Allen, Dr. Paul McCombs.  As he is Plaintiff's treating physician, please let me know if you can coordinate his deposition.  If you are okay with us contacting his office for purposes of scheduling his deposition only, please advise and we will be happy to do so.

I am available September 26, October 3, October 6-9 for his deposition.

I look forward to hearing from you.

Thanks,

Tricia T. Olson
*Licensed in Kentucky and Tennessee*
Adams and Reese LLP
424 Church Street, Suite 2800
Nashville, TN 37219
Direct: (615) 259-1007
Fax: (615) 259-1470
tricia.olson@arlaw.com
www.arlaw.com

# EXHIBIT G

# THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE AT NASHVILLE

CARL ADAMS,                              )
                                         )
    Plaintiff,          )
                                         )
v.                                       )    No. 3:13-cv-01449
                                         )    JURY DEMAND
JOHN DOE and M.P. EXPRESS, INC.          )
                                         )
    Defendants.         )
                                         )

## NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that pursuant to Rules 30 and 26, Fed. R. Civ. P., Defendants M.P. Express, Inc. will take the deposition of Carl Adams at the office of Bart Durham, 1712 Parkway Towers, 404 James Robertson Parkway, Nashville, Tennessee 37219, commencing at 10:00 a.m. on September 4, 2014.

The deposition will be recorded by stenographic means and will continue from day to day until completed.  You are invited to attend and cross-examine.

Dated:  August 15, 2014

Respectfully submitted,

*Tricia T. Olson*

Tricia T. Olson (#24643)
ADAMS AND REESE LLP
424 Church Street, Suite 2700
Nashville, Tennessee 37219
Phone:  (615) 259-1450;
Fax:     (615) 259-1470
Email:  kyle.young@arlaw.com;
       tricia.olson@arlaw.com;
*Attorneys for Defendants*

1

## CERTIFICATE OF SERVICE

I the undersigned hereby certify that a true and correct copy of the foregoing has been served via U.S. Mail, postage prepaid, this 15th day of August, 2014, to the following:

Bart Durham
Blair Durham
Attorneys for Plaintiff
1712 Parkway Towers
404 James Robertson Parkway
Nashville, Tennessee 37219

Ashonti T. Davis
Attorney for Tennessee Farmers Mutual
Insurance Company
Butler Snow
150 3rd Avenue S. Ste. 1600
Nashville, TN 37201

Tricia T. Olson

# EXHIBIT H

# THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE AT NASHVILLE

CARL ADAMS,                    )
                               )
         Plaintiff,            )
                               )
v.                             )      No. 3:13-cv-01449
                               )      JURY DEMAND
BOHDAN FARBOTA and M.P. EXPRESS, )
INC.                           )
                               )
         Defendants.           )

## CROSS-NOTICE OF DEPOSITION OF PAUL MCCOMBS, M.D.

To:   Dr. Paul McCombs
      Howell Allen Clinic
      2011 Murphy Ave., Suite 301
      Nashville, TN 37203

      Bart Durham
      Blair Durham
      404 James Robertson Parkway
      1712 Parkway Towers
      Nashville, TN 37219

PLEASE TAKE NOTICE that the undersigned counsel for Defendants will also take the

deposition of Dr. Paul McCombs on November 19, 2014 at Howell Allen, 2011 Murphy Avenue,

Suite 301, Nashville, TN 37203, commencing at 2:00 p.m.

The deposition will be recorded by stenographic means and will continue from day to day

until completed.  Defendant requests that, at the time and place of the taking of said deposition, the

Deponent bring the items listed on "Exhibit A" attached hereto.

Dated:  October 10, 2014

1

Respectfully submitted,

*Tricia T. Olson*

Tricia T. Olson (#24643)
ADAMS AND REESE LLP
424 Church Street, Suite 2700
Nashville, Tennessee 37219
Phone: (615) 259-1450;
Fax: (615) 259-1470
Email: kyle.young@arlaw.com;
tricia.olson@arlaw.com;
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I the undersigned hereby certify that a true and correct copy of the foregoing has been served via U.S. Mail, postage prepaid, this 10th day of October, 2014, to the following:

Bart Durham
Blair Durham
Attorneys for Plaintiff
1712 Parkway Towers
404 James Robertson Parkway
Nashville, Tennessee 37219

Ashonti T. Davis
Attorney for Tennessee Farmers Mutual
Insurance Company
Butler Snow
150 3rd Avenue S. Ste. 1600
Nashville, TN 37201

Dr. Paul McCombs
Howell Allen Clinic
*2011 Murphy Ave., Suite 301*
Nashville, TN 37203

*Tricia T. Olson*

Tricia T. Olson

2

## EXHIBIT A

Your **entire file** in connection with your treatment of Carl Adams including but not limited to all documents, medical records, x-rays, radiographic film, memoranda, photographs, reports, medical bills (paid or unpaid), invoices, statements, prescriptions, notes, diagrams and communications.